# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ORGANIC SEED GROWERS AND TRADE ASSOCIATION, ORGANIC CROP IMPROVEMENT ASSOCIATION INTERNATIONAL, INC., THE CORNUCOPIA INSTITUTE, DEMETER ASSOCIATION, INC., CENTER FOR FOOD SAFETY, BEYOND PESTICIDES, NAVDANYA INTERNATIONAL, MAINE ORGANIC FARMERS AND GARDENERS ASSOCIATION, NORTHEAST ORGANIC FARMING ASSOCIATION OF NEW YORK, NORTHEAST ORGANIC FARMING ASSOCIATION/MASSACHUSETTS CHAPTER, INC., NORTHEAST ORGANIC FARMING ASSOCIATION OF NEW HAMPSHIRE, NORTHEAST ORGANIC FARMING ASSOCIATION OF RHODE ISLAND, CT NOFA, NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT, RURAL VERMONT, OHIO ECOLOGICAL FOOD & FARM ASSOCIATION, FLORIDA CERTIFIED ORGANIC GROWERS AND CONSUMERS INC., SOUTHEAST IOWA ORGANIC ASSOCIATION, MENDOCINO ORGANIC NETWORK, NORTHEAST ORGANIC DAIRY PRODUCERS ALLIANCE, MIDWEST ORGANIC DAIRY PRODUCERS ALLIANCE, WESTERN ORGANIC DAIRY PRODUCERS ALLIANCE, CANADIAN ORGANIC GROWERS, PEACE RIVER ORGANIC PRODUCERS ASSOCIATION, FAMILY FARMER SEED COOPERATIVE, SUSTAINABLE LIVING SYSTEMS, GLOBAL ORGANIC ALLIANCE, FOOD DEMOCRACY NOW!, FARM-TO-CONSUMER LEGAL DEFENSE FUND, WESTON A. PRICE FOUNDATION, MICHAEL FIELDS AGRICULTURAL INSTITUTE, FEDCO SEEDS INC., ADAPTIVE SEEDS, LLC, SOW TRUE SEED, SOUTHERN EXPOSURE SEED EXCHANGE, MUMM'S SPROUTING SEEDS, BAKER CREEK HEIRLOOM SEED CO., LLC, COMSTOCK, FERRE & CO., LLC, SEEDKEEPERS, LLC, SISKIYOU SEEDS, COUNTRYSIDE ORGANICS, WILD GARDEN SEED, CUATRO PUERTAS, SEED WE NEED, ALBA RANCH, WILD PLUM FARM, GRATITUDE GARDENS, RICHARD EVERETT FARM, LLC, PHILADELPHIA COMMUNITY FARM, INC., GENESIS FARM, CHISPAS FARMS LLC, MIDHEAVEN FARMS, KOSKAN FARMS, CALIFORNIA CLOVERLEAF FARMS, NORTH OUTBACK FARM, TAYLOR FARMS, INC., RON GARGASZ ORGANIC FARMS, ABUNDANT ACRES, T & D WILLEY FARMS, FULL MOON FARM, INC., COMMON GOOD FARM, LLC, AMERICAN BUFFALO COMPANY, RADIANCE DAIRY, QUINELLA RANCH, NATURE'S WAY FARM LTD., LEVKE AND PETER EGGERS FARM, FREY VINEYARDS, LTD., BRYCE STEPHENS, CHUCK NOBLE, LARHEA PEPPER, PAUL ROMERO, BRIAN WICKERT, BRUCE DRINKMAN, MURRAY BAST, and DONALD WRIGHT PATTERSON, JR., *Plaintiffs-Appellants,*
and
OCIA RESEARCH AND EDUCATION INC., NORTHERN PLAINS SUSTAINABLE AGRICULTURE SOCIETY, MANITOBA ORGANIC ALLIANCE, UNION PAYSANNE, FAMILY FARM DEFENDERS INC., INTERLAKE FORAGE SEEDS LTD., KIRSCHENMANN FAMILY FARMS INC., AND JARDIN DEL ALMA, *Plaintiffs,*

*v.*

MONSANTO COMPANY AND MONSANTO TECHNOLOGY LLC, *Defendants-Appellees.*

Appeal from the United States District Court for the Southern District of New York
in Case No. 11-CV-2163, Judge Naomi Reice Buchwald

## BRIEF FOR APPELLEES

SETH P. WAXMAN
PAUL R.Q. WOLFSON
TODD C. ZUBLER
GREGORY H. LANTIER
CAROLYN J. CHACHKIN
RACHEL L. WEINER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

September 13, 2012

**AMENDED CERTIFICATE OF INTEREST**

Counsel for Defendants-Appellees certifies the following:

1.    The full name of every party or amicus represented by us is:

> Monsanto Company
> Monsanto Technology LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

> None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:

> None

4.    The names of all law firms and the partners or associates who appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

> WILMER CUTLER PICKERING HALE AND DORR LLP:  Seth P. Waxman, Paul R.Q. Wolfson; Todd C. Zubler; Gregory H. Lantier; Carolyn Jacobs Chachkin; Rachel L. Weiner

/s/ Seth P. Waxman
Seth P. Waxman

Dated: September 13, 2012

# TABLE OF CONTENTS

Page

AMENDED CERTIFICATE OF INTEREST ............................................................i

TABLE OF AUTHORITIES ...............................................................................iv

STATEMENT OF RELATED CASES ....................................................................1

INTRODUCTION ...............................................................................................1

STATEMENT OF ISSUES ..................................................................................2

STATEMENT OF THE CASE ..............................................................................2

STATEMENT OF FACTS ...................................................................................3

    A.    Monsanto's Patented Biotechnology ..................................................3

    B.    Federal Regulation Of Agricultural Biotechnology And
        Organic Food Production ....................................................................8

    C.    District Court Proceedings ...............................................................10

        1.    Plaintiffs' complaint and amended complaint .........................10

        2.    Monsanto's motion to dismiss and the district
              court's decision ......................................................................13

SUMMARY OF ARGUMENT ............................................................................17

ARGUMENT ...................................................................................................

I.    THERE IS NO JUSTICIABLE CASE OR CONTROVERSY BETWEEN
    THE PARTIES ............................................................................................20

    A.    There Is No "Definite," "Concrete," "Substantial,"
        "Real," Or "Immediate" Dispute Between The Parties .....................21

1.    Monsanto's prior patent-enforcement actions
involving different parties do not establish a
substantial, concrete, definite, real, and immediate
controversy between Monsanto and these Plaintiffs ................24

2.    The non-patent cases that Plaintiffs cite do not
change the result.......................................................................33

B.    Plaintiffs' Own Activity And Allegations Further
Underscore The Lack Of Any "Substantial," "Definite,"
"Concrete," "Real," And "Immediate" Controversy .........................40

II.    WHILE PLAINTIFFS CLEARLY OPPOSE BIOTECHNOLOGY, THEY
HAVE NO BASIS TO INVOKE THE JURISDICTION OF THE FEDERAL
COURTS TO ADVOCATE THOSE VIEWS ...........................................................49

CONCLUSION ..................................................................................................52

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227 (1937) .............................21, 34

*Allen v. Wright*, 468 U.S. 737 (1984) ................................................................22, 47

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) .........................................................31

*Association for Molecular Pathology v. U.S. Patent & Trademark Office*, --- F.3d ---, slip. op. (Fed. Cir. Aug. 16, 2012).........................*passim*

*Association for Molecular Pathology v. U.S. Patent & Trademark Office*, 653 F.3d 1329 (Fed. Cir. 2011) .................................13, 14, 17, 22, 27

*Association for Molecular Pathology v. Myriad Genetics, Inc.*, 132 S. Ct. 1794 (2012) .............................................................................................13

*Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007) .................................................................................................23, 41

*Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007*)* ....................................................................36

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1971)..........................................................36, 37

*Cardinal Chemical Co. v. Morton International, Inc.*, 508 U.S. 83 (1993)..........................................................................................................40

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) ......22, 41, 44, 45

*Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573 (Fed. Cir. 1993) .................................................................................................31

*Creative Compounds, LLC v. Starmark Laboratories*, 651 F.3d 1303 (Fed. Cir. 2011)..............................................................................25

*Dey Pharma, LP v. Sunovion Pharmaceuticals Inc.*, 677 F.3d 1158 (Fed. Cir. 2012).......................................................................45, 46

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980)......................................................50

*Doe v. Bolton*, 410 U.S. 179 (1973)..........................................................36

*Doe v. Bolton*, 319 F. Supp. 1048, 1050 (N.D. Ga. 1970)........................................36

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010)......................................................35

*Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004)........................42

*Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358 (Fed. Cir. 2009) .............................................................................................17

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ...............................35

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377 (Fed. Cir. 2010)........................................................................23, 25, 42

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124 (2001)........................................................................5, 50

*Juicy Whip, Inc. v. Orange Bang, Inc.*, 185 F.3d 1364 (Fed. Cir. 1999)................50

*Land v. Dollar*, 330 U.S. 731 (1947) ...............................................................24, 31

*Los Angeles v. Lyons*, 461 U.S. 95 (1983).........................................................39, 42

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................22, 44

*McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178 (1936)..............................................................................................31

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ............................*passim*

*Micron Technology, Inc. v. Mosaid Technologies, Inc.*, 518 F.3d 897 (Fed. Cir. 2008)..................................................................................25

*Monsanto Co. v. Bowman*, 657 F.3d 1341 (Fed. Cir. 2011)...................................27

*Monsanto Co. v. David*, 516 F.3d 1009 (Fed. Cir. 2008) .................................28, 50

*Monsanto Co. v. McFarling*, 302 F.3d 1291 (Fed. Cir. 2002) ................................50

*Monsanto Co. v. McFarling*, 363 F.3d 1336 (Fed. Cir. 2004) ...........................6, 28

*Monsanto Co. v. Nelson*, 2001 U.S. Dist. LEXIS 25132 (E.D. Mo. Sept. 10, 2001) ..............................................................................................29

*Monsanto Co. v. Nelson*, No. 4:00-CV-1636 ...........................................................32

*Monsanto Co. v. Parr*, 545 F. Supp. 2d 836 (N.D. Ind. 2008) .........................28, 32

*Monsanto Co. v. Ralph*, 382 F.3d 1374 (Fed. Cir. 2004) .......................................27

*Monsanto Co. v. Scruggs*, 459 F.3d 1328 (Fed. Cir. 2006) ............................5, 6, 28

*Prasco, LLC v. Medicis Pharmaceutical Corp.*, 537 F.3d 1329 (Fed. Cir. 2008)..............................................................................22, 39, 42, 49

*SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007) .......................................................................................................43, 47

*Texas America Oil Corp. v. U.S. Department of Energy*, 44 F.3d 1557 (Fed. Cir. 1995)......................................................................................38

*United States v. Mendoza*, 464 U.S. 154 (1984).................................................36, 37

*Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982) ...........................................................51

*Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) ...............................35

*Wetmore v. Rymer*, 169 U.S. 115 (1898) .................................................................31

## FOREIGN CASES

*Monsanto Canada Inc. v. Schmeiser*, [2004] 1 S.C.R. 902 (Can.)..........................28

*Monsanto Canada Inc. v. Schmeiser*, 2001 FCT 256 [120] (Can.) .................28, 32

## STATUTES AND RULES

Organic Food Production Act of 1990, 7 U.S.C §§ 6501 *et seq.* ............................9

Plant Protection Act, 7 U.S.C. §§ 7701 *et seq.* ........................................................8

28 U.S.C. § 2201 ........................................................................................21

35 U.S.C. § 101 ...........................................................................11, 20, 50

Federal Rule of Civil Procedure 12(b)(1) ...........................................................3, 13

## ADMINISTRATIVE AGENCY MATERIALS

National Organic Program, 65 Fed. Reg. 80548 (Dec. 21, 2000) ............................9

Office of Science and Technology Policy, *Coordinated Framework for Regulation of Biotechnology*, 51 Fed. Reg. 23302 (June 26, 1986) ...........................................................................................8

## OTHER AUTHORITIES

5C Wright & Miller, *Federal Practice & Procedure* (3d ed. 2012) .......................31

## STATEMENT OF RELATED CASES

Defendants-Appellees Monsanto Company and Monsanto Technology LLC ("Monsanto") agree with the statement of related cases contained in the opening brief of Plaintiffs-Appellants Organic Seed Growers and Trade Association *et al.* ("Plaintiffs").

## INTRODUCTION

Plaintiffs' opening brief does not (and cannot) dispute that *not a single one* of the present Plaintiffs, who comprise "more than 300,000 individuals and 4,500 farms or farmers" (Br. 1), has ever been approached, much less threatened, by Monsanto in connection with Monsanto's patents.  In fact, Plaintiffs openly state that they: (1) have *not* been threatened by Monsanto regarding a patent-infringement claim; (2) are *not* making, using, or selling Monsanto's transgenic seed; and (3) have *no desire* to make, use, or sell Monsanto's products in the future.  Br. 15.  For its part, Monsanto has clearly stated that it has no reason, desire, or intent to sue Plaintiffs or others like them.

Instead of articulating an actual, imminent dispute, Plaintiffs repeat their unsubstantiated assertion (made in the district court) that Monsanto's enforcement of its patent rights against *other* growers "threatens" Plaintiffs here.  (Br. 2, 5, 11, 20).  But as the district court found, Plaintiffs have engaged in a "transparent effort to create a controversy where none exists."  A23.  Article III of the Constitution

and the Declaratory Judgment Act require a substantial, real, and immediate controversy between parties, not a hypothetical dispute constructed solely to further an anti-biotechnology political agenda. The district court's decision dismissing for lack of subject-matter jurisdiction should be affirmed.

## STATEMENT OF ISSUES

Whether the district court correctly dismissed Plaintiffs' Amended Complaint—seeking a declaration that 23 Monsanto patents encompassing more than 600 claims are invalid, unenforceable, and not infringed—for lack of subject-matter jurisdiction.

## STATEMENT OF THE CASE

On March 29, 2011, Plaintiffs filed their initial Complaint in the United States District Court for the Southern District of New York, seeking a broad declaration that 23 separate Monsanto biotechnology patents (encompassing more than 600 claims) are all invalid, unenforceable, and not infringed on numerous grounds. A54-57; A87-98. The Complaint further requested a declaration that Monsanto cannot be entitled to any remedy against Plaintiffs. A99. On June 1, 2011, Plaintiffs filed an Amended Complaint containing the same substantive allegations but adding several new plaintiffs and a description of events transpiring since the filing of the original Complaint (including an April 2011 letter exchange between the parties' counsel). A108-183.

On July 12, 2011, Monsanto filed a motion to dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* A230-514. Following briefing and oral argument, the district court granted Monsanto's motion on February 24, 2012, concluding that, "[t]aken together, it is clear that these circumstances do not amount to a substantial controversy and that there has been no injury traceable to defendants." A23. The court issued a final order and judgment on February 27, 2012, dismissing Plaintiffs' action for lack of subject-matter jurisdiction. Plaintiffs appealed to this Court. A857-861.

## STATEMENT OF FACTS

### A.    Monsanto's Patented Biotechnology

Monsanto develops, manufactures, licenses, and sells agricultural biotechnology and agricultural chemicals. *See* A257-314; A509-510. After investing substantial time, expense, and expertise, Monsanto has developed new seed technology through the identification, isolation, and carefully controlled transfer of novel genes into crop seed. A266-270; A311-312. These transgenic seeds give the resulting plants an assortment of beneficial traits, including herbicide resistance, pest resistance, increased yield potential, improved nutritional content (*e.g.*, reduction of trans-fatty acids), more efficient conversion of solar energy, and drought tolerance. *See, e.g.*, *id.*; A510-511.

Millions of growers around the world have adopted products containing Monsanto's biotechnology because of their numerous advantages. As a recent study by the National Research Council of the National Academy of Sciences concluded, "Many adopters of [transgenic] crops have experienced either lower costs of production or higher yields, and sometimes both." *See* A316 (Report in Brief, National Research Council, *The Impact of Genetically Engineered Crops on Farm Sustainability in the United States*, 2 (2010) ("NRC Report in Brief")).

Monsanto's products also have significant environmental and health benefits. Monsanto's popular Roundup Ready® seeds, for example, are resistant to the herbicide glyphosate (sold or marketed by Monsanto as Roundup®), and thus allow growers to apply the herbicide after the plants have emerged from the soil without fear of killing the plants themselves. *See* A267-269. This plant characteristic reduces the need for farmers to till the soil, which diminishes soil erosion, reduces labor and fuel costs, and conserves valuable soil moisture in drier climates—representing perhaps "the largest single environmental benefit of [genetically engineered] crops." A316 (NRC Report in Brief, at 2). Monsanto's Roundup Ready® seeds also allow growers to use safer herbicides. A319, A323 (Ralph E. Heimlich et al., *Genetically Engineered Crops: Has Adoption Reduced Pesticide Use?*, Agricultural Outlook 13, 17 (Aug. 2000)). Numerous other

sources have recognized the environmental and societal benefits of biotech crops

generally and Monsanto's products specifically.[1]

Monsanto spends over one billion dollars annually on research and

development, and to protect its significant investments in these popular

technologies, Monsanto relies on the patent system. A268, A270. Plant materials

are eligible for patenting under the Patent Act, *see J.E.M. Ag Supply, Inc. v.*

*Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 130-131 (2001), and the United States

Patent and Trademark Office has granted Monsanto numerous patents covering

both traits and seeds, as well as methods for their creation and use, *see, e.g.*,

*Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1336-1338 (Fed. Cir. 2006) (upholding

---

[1]    *See, e.g.*, A362 (U.S. Dep't of Agriculture, *Monsanto Company and KWS SAAT AG Supplemental Request for Partial Deregulation of Sugar Beet Genetically Engineered to be Tolerant to the Herbicide Glyphosate: Final Environmental Assessment* 290 (Feb. 2011)) ("The adoption of herbicide-tolerant crops such as H7-1 sugar beets, glyphosate-tolerant soybeans and glyphosate-tolerant corn will result in the substitution of glyphosate for some of the previously used herbicides…. There are known benefits associated with the use of glyphosate herbicides compared to herbicides currently used…. Glyphosate has documented favorable characteristics with regard to risk to human health, non-target species, and the environment."); A377 (Dan Towery & Steve Werblow, *Conservation Technology Information Center, Facilitating Conservation Farming Practices and Enhancing Environmental Sustainability with Agricultural Biotechnology* 1 (2010)) ("[P]lant biotechnology and the sustainable farming systems it helps facilitate … are helping farmers grow more food, feed, fiber and fuel while protecting the environment."); A443 (Janet E. Carpenter & Leonard P. Gianessi, Nat'l Center for Food and Agricultural Policy, *Agricultural Biotechnology: Updated Benefit Estimates* 39 (Jan. 2001)) ("[The] benefits of the introduction of Roundup Ready soybeans include a cost savings of $216 million in annual weed control costs and 19 million fewer soybean herbicide applications per year.").

validity of Monsanto biotech patents). Monsanto authorizes growers to use its patented biotechnology only under limited-use licenses (*see* A172-175; A511), which this Court has repeatedly upheld. *See, e.g.*, *Scruggs*, 459 F.3d at 1338-1341; *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1341-1343 (Fed. Cir. 2004).

Monsanto has certainly enforced its patents against growers who intentionally infringe—for example, by planting seed containing Monsanto's patented traits without obtaining a license, or by replanting saved seed containing those traits, which is not allowed under Monsanto's license. But Monsanto has explicitly stated its commitment not to take legal action against growers whose crops might inadvertently contain traces of Monsanto's patented traits. Monsanto's website includes "Monsanto's Commitment: Farmers and Patents," which states: "It has never been, nor will it be, Monsanto policy to exercise its patent rights where trace amounts of our patented seed or traits are present in [a] farmer's fields as a result of inadvertent means." A508; A512-513. This statement is meant to assure growers that Monsanto will not assert a patent-infringement claim where Monsanto's patented traits appear inadvertently (*e.g.*, through cross-pollination from nearby fields where biotech crops are grown) and thus are present only in minimal quantities. A513. Consistent with its stated policy, Monsanto has never filed a patent-infringement lawsuit against a USDA-certified organic farm or

handling operation for the presence of patented traits in its certified organic operations. *Id.*

Indeed, Monsanto believes firmly in coexistence between agricultural biotechnology and organic agriculture. A512. Such coexistence is not only possible, but proven. Since long before the introduction of agricultural biotechnology, neighboring growers have implemented coexistence practices to limit cross-pollination that would harm a crop's value.[2] Furthermore, during the last fifteen years, biotech and organic crops have successfully coexisted, with both the biotech and the organic industries growing steadily and significantly.[3]

---

[2]    Field corn and popcorn, for example, are capable of cross-pollinating, and each has genetic traits that would damage the other crop's value if permitted to commingle. Yet farmers commonly plant field corn and popcorn in the same geographic regions by employing cooperative management techniques that allow coexistence. *See, e.g.,* A451-453 (B. Rosie Lerner & Michael N. Dana, *Growing Sweet Corn* (May 2001)); A512; *see generally* A460 (Declaration of Cindy J. Smith, Administrator of USDA Animal and Plant Health Inspection Service, filed in *Center for Food Safety v. Thomas J. Vilsack*, No. 3:08-cv-484-JSW (N.D. Cal.), Dkt. No. 277 (Feb. 12, 2010)) ("For decades growers have successfully cultivated crops bearing different traits, often on adjoining fields, whether such traits were introduced into the crops by conventional means or genetic engineering. Growers have always had the choice of which crops to grow, and they have had to contend with commingling, admixtures, and other contaminants in their crops. Studies of coexistence of major GE and non-GE crops in North America and the European Union (E.U.) have demonstrated that there has been no significant gene flow from GE crops and that GE and non-GE crops are coexisting with minimal adverse economic effects." (citations omitted)).

[3]    *See* A472 (U.S. Dep't of Agriculture, Economic Research Service, *Organic Production Data Set, available at* http://www.ers.usda.gov/Data/Organic/ (last visited July 11, 2011)) ("Organic farming has been one of the fastest growing segments of U.S. agriculture for over a decade. The U.S. had under a million acres

**B.     Federal Regulation Of Agricultural Biotechnology And Organic Food Production**

In 1986, the President's Office of Science and Technology Policy established a "comprehensive federal regulatory policy for ensuring the safety of biotechnology research and products."  *See* Office of Science and Technology Policy, *Coordinated Framework for Regulation of Biotechnology*, 51 Fed. Reg. 23302, 23302 (June 26, 1986).  Through this coordinated framework, the Animal and Plant Health Inspection Service of the U.S. Department of Agriculture (USDA) works in conjunction with the Environmental Protection Agency (EPA) and the Food and Drug Administration (FDA) to analyze the health and environmental impacts of biotech crops, as well as their impact on other growers (including organic growers).  A493 (U.S. Dep't of Agriculture, Animal and Plant Health Inspection Service, Biotechnology Regulatory Services, Program Aid No. 1862, *Coordinated Framework for the Regulation of Biotechnology* 2-3 (Apr. 2006)) ("Together, [the USDA, EPA, and FDA] ensure that the products of modern biotechnology are safe to grow, safe to eat, and safe for the environment.").

The USDA regulates agricultural biotechnology under the Plant Protection Act, 7 U.S.C. §§ 7701 *et seq.*  USDA has consistently concluded that safe and

---

of certified organic farmland when Congress passed the Organic Foods Production Act of 1990.  By the time USDA implemented national organic standards in 2002, certified organic farmland had doubled, and doubled again between 2002 and 2005.").

sustainable coexistence among organic, conventional, and biotech agriculture is possible and should be promoted. *See, e.g.*, A478 (U.S. Dep't of Agriculture, *Record of Decision: Glyphosate-Tolerant Alfalfa Events n01 and J163: Request for Nonregulated Status* 4 (Jan. 27, 2011)) ("[T]he USDA values and promotes coexistence ... [and its] purpose and need is to promote programs that support coexistence of all types of agricultural practices," including biotech, conventional, and organic.).

The USDA also regulates organic agriculture under the Organic Food Production Act, 7 U.S.C §§ 6501 *et seq.*, and through the USDA's National Organic Program, which regulates growers that wish to market agricultural products as organically produced. The USDA has specifically considered the issue of "genetic drift," and under the USDA's regulations, the inadvertent presence of biotech traits in crops does not prevent organic certification, as long as organic farms follow appropriate growing processes. *See* National Organic Program, 65 Fed. Reg. 80548, 80556 (Dec. 21, 2000); *id.* at 80632 ("[T]hese regulations do not establish a 'zero tolerance' standard" for the presence of biotech traits or material.); *see also* A498 (U.S. Dep't of Agriculture, Policy Memorandum, at 2 (Apr. 15, 2011)) (reaffirming this position). The USDA has reported that no grower has ever lost organic certification as a result of inadvertent presence of transgenic material. *See* A503.

### C.    District Court Proceedings

#### 1.    Plaintiffs' complaint and amended complaint

Plaintiffs' initial complaint, filed on March 29, 2011, sought a declaration that 23 separate Monsanto biotechnology patents are—in their entirety—invalid, unenforceable, and not infringed, and further requested that Monsanto not be entitled to any remedy.  A54-57; A87-99.  According to their allegations, Plaintiffs are a collection of farms, farmers, seed businesses, and agricultural organizations that engage in and support organic and conventional agriculture.  A109; A112-142.  Plaintiffs maintain that they "do not want to use or sell transgenic seed" in their fields and handling operations.  A109; *see also* Br. 15 (asserting that "none of the Plaintiffs have or are yet making, using or selling Monsanto's transgenic seed").  Nevertheless, Plaintiffs claim that they "fear" that "if they do [] become contaminated by transgenic seed," they "could" potentially be accused of patent infringement by Monsanto at some point in the future.  A109; *see also* A134-135; A141-142.

The Amended Complaint, filed on June 1, 2011, alleges (like the initial Complaint) that 23 Monsanto patents "are all invalid[]" under virtually every possible theory of invalidity available under the Patent Act—*i.e.*, unpatentable subject matter under Section 101; anticipation, obviousness, and double-patenting under Sections 102 and 103; and failure to satisfy the requirements of written

description, enablement, and best mode under Section 112.  A110-111; A161-162; A167-168.  Plaintiffs' "principal" argument is that all of Monsanto's patents are invalid under 35 U.S.C. § 101 for failing to be "useful."  *See* A110; *see also* A142-151, A161.  Plaintiffs, however, provide little or no detail on any of their claims.  For example, Plaintiffs' invalidity allegations merely recite each invalidity doctrine, without identifying or addressing any particular patent claim (of the more than 600 claims apparently asserted), without identifying any prior-art reference, and without providing any explanation as to why any claim is invalid.  A167-168.[4]

The Amended Complaint does not allege that Monsanto's transgenic traits have actually entered Plaintiffs' crops or seeds by gene flow or other inadvertent means.  Plaintiffs likewise do not allege that Monsanto has ever contacted any of them, much less threatened suit, in connection with Monsanto's patents.  Rather, Plaintiffs' alleged fear of suit stems solely from Monsanto's alleged "investigation, accusation and litigation of patent infringement claims against *other* farmers," including those who allegedly "did not want to be contaminated by transgenic seed."  A155 (emphasis added).

---

[4]    Plaintiffs' allegations of non-infringement and unenforceability are similarly vague and conclusory. *See, e.g.*, A162 (non-infringement allegations consisting of nine lines that identify *no* particular claim or patent that Plaintiffs may be accused of infringing and *no* particular plaintiff's product(s) that may potentially infringe); A165 (unenforceability allegation consisting of one sentence stating, without any further explanation, that all of Monsanto's patents "are unenforceable due to prosecution laches because Monsanto caused unreasonable and unexplained delay in the prosecution of the patents that would prejudice Plaintiffs").

On April 18, 2011—after the filing of the original Complaint—Plaintiffs' counsel sent a letter to Monsanto's counsel, stating that while "none of our clients intend to possess, use or sell any transgenic seed," they fear that future "contamination" by such seed "could then subject them to claims of patent infringement from Monsanto." A180. Plaintiffs' counsel requested "that Monsanto expressly waive any claim for patent infringement it may ever have against [Plaintiffs] and memorialize that waiver by providing a written covenant not to sue." *Id.* He further asserted that "*[i]f*" Monsanto did not respond, "[i]t would *then* be reasonable for our clients to feel that they would be at risk of having Monsanto assert claims of patent infringement against them should they ever become contaminated by transgenic seed…." A180-181 (emphases added).

In a responsive letter dated April 28, 2011, Monsanto's counsel explained that

> Monsanto is unaware of any circumstances that would give rise to any claim for patent infringement or any lawsuit against your clients. Monsanto therefore does not assert and has no intention of asserting patent infringement claims against your clients.

A183. Monsanto's counsel also reiterated Monsanto's policy of not exercising its patent rights against farmers whose fields inadvertently contain trace amounts of patented traits. He further stated that, taking Plaintiffs representations as true, "any fear of suit or other action is unreasonable, and any decision not to grow certain crops unjustified." *Id.*

12

### 2. Monsanto's motion to dismiss and the District Court's decision

Monsanto moved to dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* A230-514.  Plaintiffs filed their opposition on August 11, 2011 (*see* A674-732), shortly after this Court issued its decision in *Association for Molecular Pathology v. U.S. Patent & Trademark Office* ("*AMP I*"), 653 F.3d 1329, 1348 (Fed. Cir. 2011), *vacated on other grounds sub nom. Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 132 S. Ct. 1794 (2012).  Essentially conceding that this Court's decision in *AMP I* required dismissal of their claims, Plaintiffs principally argued that *AMP I*'s jurisdictional holding was inconsistent with Supreme Court and Federal Circuit precedent.  A687; A693 ("[T]he recent *AMP* decision is quite confused on this issue.").[5]  Plaintiffs' opposition included declarations from five specific plaintiffs expressing their concern about potentially "being accused of patent infringement by Monsanto" (*see* A707-723).

On February 24, 2012, the district court granted Monsanto's motion to dismiss for lack of subject-matter jurisdiction.  In a thorough opinion, the district court considered whether, under *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S.

---

[5]   At oral argument, Plaintiffs' counsel also explicitly "concede[d] there is no case out there that is on all fours with [the present case in upholding jurisdiction] where there has not been at least some communication" by the patentee directed toward the declaratory judgment plaintiff(s).  A834.

118 (2007), and its progeny, "all the circumstances" "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." A9 (quoting *AMP I*, 653 F.3d at 1342-1343, in turn quoting *MedImmune*, 549 U.S. at 127 (quotation marks omitted)).

The court began by addressing whether Monsanto's alleged actions had created an actual controversy with Plaintiffs. It observed that "Plaintiffs do not allege that defendants have ever demanded royalty payments from plaintiffs, identified any of plaintiffs' conduct as potentially infringing, or even initiated any contact with plaintiffs whatsoever." A12. Rather, the court noted, Plaintiffs based their argument for jurisdiction on three types of alleged actions by Monsanto:

> (1) a purported "pattern of enforcing [Monsanto's] patent rights against non-plaintiff farmers through litigation or threats of litigation;"
>
> (2) a supposed "'implicit threat' in [Monsanto's] statement that it is not their policy to enforce their patent rights against farmers whose crops inadvertently acquire trace amounts of patented seeds or traits;" and
>
> (3) Monsanto's "refusal to provide plaintiffs with a blanket covenant not to sue."

*Id.* The district court concluded these allegations were insufficient to establish jurisdiction.

*First*, although the court suggested that "suits brought by the patentee against parties other than the declaratory judgment plaintiffs may suffice to establish a case or controversy," it found that possibility inapplicable in this case, because suits against nonparties could establish a case or controversy "only if those suits are sufficiently similar to the one that the patentee may potentially bring against the declaratory judgment plaintiffs." A13. The court concluded that the Plaintiffs here had failed to show that Monsanto's prior suits were brought against "similarly situated parties." A14-15. Although Plaintiffs alleged that Monsanto sued inadvertent users of Monsanto's patented traits, Monsanto specifically denied that contention (A6), and the district court found that those allegations were "belied by the decisions in the suits against the referenced individuals" (A15). The court further found that Plaintiffs "overstate the magnitude of defendants' patent enforcement" and that the handful of lawsuits Monsanto files each year is "hardly significant when compared to the number of farms in the United States." A14. Thus, Monsanto's suits were "at best, … only minimal evidence of any objective threat of injury to plaintiffs" and "insufficient" to create a case or controversy. A15. The court also called Plaintiffs' allegations that Monsanto has "threatened, though not sued" inadvertent users "diaphanous" and observed that they did "not add much weight to the substantiality of the dispute." A16, A22.

*Second*, the district court found that "[i]t is objectively unreasonable for plaintiffs to read [Monsanto's Commitment] as a threat."  A16; *see also* A23 ("Defendants' statement … is, if anything, a source of comfort rather than worry"). The court rejected "plaintiffs' deliberate misreading" of the Commitment and found that Plaintiffs' post-filing letter to Monsanto "was clearly intended to be used as a prop in this litigation" and "seems to have been nothing more than an attempt to create a controversy where none exists."  A17-18.

*Third*, the court dismissed Plaintiffs' attempt to base jurisdiction on Monsanto's refusal to provide plaintiffs with a blanket covenant not to sue.  The court found that the requested waiver "was so broadly framed as to preclude any realistic chance of defendants' acceptance" and deemed "Plaintiffs' argument [] groundless and their tactics unacceptable."  A19.

The court next considered whether Plaintiffs' conduct created an "immediate" and "real" controversy.  A20.  Because Plaintiffs did not allege that they currently infringe or that they intend to infringe, the court considered whether Plaintiffs could base jurisdiction on their fear of "future" infringement liability "if and when they become contaminated by Monsanto's seed."  *Id.* (citing A110); *see also* A23.  The court found Plaintiffs' allegations inadequate, stating that this "is the same sort of intangible worry, unanchored in time, that the Federal Circuit has

16

found insufficient to support an actual or imminent injury for standing[.]" A20-21

(citing *AMP I* (internal quotation marks omitted)).

The court also considered the contention that certain Plaintiffs already faced

"immediate injury" because they had "stopped farming certain crops for fear of

patent infringement suits brought by defendants[.]" A21 n.8.  The court again

found Plaintiffs' allegations insufficient because the alleged injury was "not

reasonable based on 'the objective words and actions of the patentee.'" *Id.*

(quoting *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir.

2009)); *see also* A16 n.6 (finding that Plaintiffs' April 18, 2011 letter "is an

implicit recognition that any anticipated risk of suit was not objectively reasonable

when the case was filed").

The court therefore dismissed the matter for lack of subject-matter

jurisdiction:  "[t]aken together, it is clear that these circumstances do not amount to

a substantial controversy and that there has been no injury traceable to defendants."

A23.

## SUMMARY OF ARGUMENT

Plaintiffs—who bear the burden of establishing the existence of a justiciable

controversy—concede that Monsanto has never directed any patent-enforcement

action at them.  In fact, Monsanto has stated just the opposite:  that it has no reason

or intent to enforce its patents against Plaintiffs. Plaintiffs further concede they do not currently use—and have no desire to use—Monsanto's patented biotechnology.

Unable to point to a single act of patent enforcement directed at any Plaintiff by Monsanto, Plaintiffs rely almost entirely on Monsanto's "history of patent assertion" against *other* parties, including allegedly those "who, like Plaintiffs, do not wish to use Monsanto's transgenic seed." Br. 15; *see also* A159. Plaintiffs' assertions, however, are both legally and factually insufficient to establish a justiciable dispute. Under its consistent precedent applying *MedImmune*, this Court has repeatedly rejected jurisdiction in situations where the patentee has not taken some targeted action *against one of the declaratory-judgment plaintiffs*.

Moreover, as the district court explicitly found, publicly available information directly undermines Plaintiffs' contention that Monsanto targets inadvertent infringers. Plaintiffs improperly fault the district court for failing to "accept as fact" their sparse allegations about Monsanto's suits against others. Monsanto contested those allegations; the district court was free to question those allegations in assuring itself of its own subject-matter jurisdiction; and those allegations, even if accepted as true, are entirely insufficient to establish a real and immediate controversy with Monsanto here.

Plaintiffs' attempted reliance on non-patent Supreme Court and Federal Circuit cases is likewise unavailing. Those cases involved more concrete threats of

enforcement by defendants and/or a more imminent likelihood that a plaintiff would engage in prohibited activity and incur liability.

The absence of any justiciable controversy is further underscored by Plaintiffs' own actions. None of the Plaintiffs is currently making, using, or selling Monsanto's transgenic seed, and none asserts any intention or desire to do so. Having thus conceded that no actual infringement has occurred, the vast majority of the Plaintiffs rely solely on their "fears" of future "contamination" and subsequent litigation—"subjective apprehensions" that this Court has repeatedly held insufficient to establish declaratory-judgment jurisdiction.

A handful of plaintiffs rely on their alleged avoidance of particular activity (such as farming particular crops). None of these Plaintiffs, however, establishes that the feared "contamination" of his crops (and thus, infringement)—let alone a resulting *infringement suit* by Monsanto—would have been immediate or even imminent if they had not altered their conduct. Other Plaintiffs allege they have undertaken activity (*e.g.*, genetic testing) to avoid use of Monsanto's patented traits. But such Plaintiffs cannot show their testing activity was coerced by Monsanto's *enforcement of its patent rights*, rather than by other concerns that would exist even if the challenged patents were invalidated (*e.g.*, a business concern requiring "zero tolerance" for transgenic material or an environmental or policy concern about risks from transgenic crops).

Because "all the circumstances" fail to establish a definite, concrete, substantial, real, and immediate dispute between these parties under *MedImmune* and its progeny, the district court properly dismissed this matter for lack of jurisdiction.  What remains is Plaintiffs' obvious disagreement with United States policy to permit and promote agricultural biotechnology.  But neither the Patent Act nor the Declaratory Judgment Act makes the federal courts a proper forum for Plaintiffs' campaign.  Plaintiffs' dispute remains purely hypothetical, and their concerns—including their "principal" invalidity argument that all claims of Monsanto's patents fail the bare "utility" requirement of § 101 because they may be "injurious" to society—involve policy questions that must be directed to Congress.  This case presents no justiciable case or controversy.

## ARGUMENT

### I.    THERE IS NO JUSTICIABLE CASE OR CONTROVERSY BETWEEN THE PARTIES

Monsanto has never initiated, threatened, or even suggested any patent-enforcement action against any of the Plaintiffs.  Indeed, Monsanto has told Plaintiffs that Monsanto has no reason, desire, or intent to enforce its patents against them.  A255; *see also* A183.  Nevertheless, Plaintiffs, who oppose agricultural biotechnology, have attempted to manufacture a judicial dispute with Monsanto by seeking a broad declaration that 23 Monsanto biotechnology patents are invalid, unenforceable, and not infringed (even though such a ruling would, at

least in the short term, only expand the use of Monsanto's biotechnology, which would then no longer be subject to any patent-law controls).  Article III of the Constitution and the Declaratory Judgment Act, however, do not permit federal courts to exercise jurisdiction over such artificial and hypothetical disagreements, engineered solely to advance a political position.

### A.    There Is No "Definite," "Concrete," "Substantial," "Real," Or "Immediate" Dispute Between The Parties

Under binding precedent from the Supreme Court and this Court, there is no justiciable "case or controversy" between Monsanto and the Plaintiffs.  The Supreme Court's decision in *MedImmune* requires a declaratory-judgment plaintiff to demonstrate that "the facts alleged, under all the circumstances, show that there is a [1] substantial controversy, [2] between parties having adverse legal interests, of sufficient [3] immediacy and [4] reality to warrant the issuance of a declaratory judgment."  *MedImmune*, 549 U.S. at 127.  *MedImmune* further explains that "the dispute [must] be [5] 'definite and [6] concrete'" and [7] "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Id*. (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)).[6]  The Declaratory Judgment Act similarly requires an [8] "actual controversy."  28 U.S.C. § 2201.

---

[6]    Plaintiffs argue that the district court "disregarded *MedImmune*'s caution against drawing bright lines and fabricated a rigid 'potential infringement is a

Further, as the district court correctly recognized, a declaratory-judgment plaintiff must show "an injury in fact traceable to the patentee." A9-10; *see also Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office* ("*AMP II*"), --- F.3d ---, slip op. at 26 (Fed. Cir. Aug. 16, 2012). If the alleged injury is that a plaintiff has been forced to alter his or her behavior, the plaintiff must show that the legal claim at issue in the case—*i.e.*, the alleged patent liability and not some other independent factor—is causing the altered behavior. A21 n.8 ("[A]s *AMP [I]* makes clear, the relevant concern is of infringement, not simply altered behavior."). Otherwise, the alleged injury will not be "redressed by a favorable decision." *See AMP II*, slip op. at 26, 34 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Allen v. Wright*, 468 U.S. 737, 751 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.").

---

matter of immediate concern' requirement that does not comport with Supreme Court or Federal Circuit precedent." Br. 26. That accusation is inaccurate and unfair. The district court began its analysis with the Supreme Court's decision in *MedImmune*, and expressly stated that "there is no bright-line rule for determining whether an action satisfies the case or controversy requirement" (A9 (citing *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008))), and that "the analysis must be calibrated to the particular facts of each case" (*id.* (citing *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 879 (Fed. Cir. 2008)). The district court also recognized that "all the circumstances" must be evaluated under *MedImmune* (A9-10 (citing *AMP I*, 653 F.3d at 1343)), and noted that a patentee's assertion of its patent rights "against other similarly situated parties" was "a fact to be considered in assessing the existence of an actual controversy under the totality of the circumstances" (A13).

Applying the principles cited above, the district court properly dismissed this matter for lack of subject-matter jurisdiction.  Plaintiffs have the burden of establishing that a justiciable controversy existed at the time they initiated this lawsuit.  *See Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1382-1385 (Fed. Cir. 2010); *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007).  Plaintiffs' opening brief, however, specifically concedes that Monsanto *has not* raised (and *could not* currently raise) a patent-infringement claim against any of them.  Br. 15.  Further, as Monsanto has publicly stated, it knows of no basis to sue Plaintiffs and has no interest in doing so.  A183.  Moreover, Plaintiffs expressly disclaim any intent to plant transgenic crops, and they strive—for reasons independent of any fear of suit by Monsanto—to avoid gene flow of transgenic material into their crops.  Plaintiffs therefore cannot credibly claim that Monsanto will seek to enforce its patents against *them*.

Faced with these facts demonstrating the absence of any real, immediate, or substantial dispute between Plaintiffs and Monsanto, Plaintiffs make numerous arguments to try to resurrect their dismissed case.  None is successful.  Plaintiffs rely principally on prior patent-enforcement actions that Monsanto has brought against *other* parties.  But such actions against other, dissimilar parties cannot create a "real and immediate" controversy with these particular Plaintiffs.  Nor are Plaintiffs correct in faulting the district court for rejecting their sparse allegations

of third-party enforcement, which Monsanto contested and which the district court was free to examine to determine whether it had subject-matter jurisdiction. *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947). Finally, Plaintiffs' attempted reliance on non-patent Supreme Court and Federal Circuit cases is unavailing: those cases are legally and factually distinguishable, involving more concrete threats of enforcement by defendants and/or a more immediate likelihood that a plaintiff would incur liability.

> **1.    Monsanto's prior patent-enforcement actions involving different parties do not establish a substantial, concrete, definite, real, and immediate controversy between Monsanto and these Plaintiffs**

Unable to allege any directed act by Monsanto toward them, Plaintiffs instead attempt to rely on "Monsanto's history of patent assertion" against other parties, including allegedly those "who, like Plaintiffs, do not wish to use Monsanto's transgenic seed." Br. 15. These groundless allegations are insufficient to establish a justiciable dispute.

*First*, Plaintiffs' allegations are *legally* insufficient. This Court has consistently rejected subject-matter jurisdiction in cases where the declaratory-judgment plaintiff could not show some affirmative act *directed against the plaintiff*. Just last month, for example, this Court reaffirmed its prior ruling in *AMP* that upheld jurisdiction only with respect to one plaintiff who alleged both: (1) an intention to actually and immediately engage in allegedly infringing

activities, and (2) "*affirmative patent enforcement actions directed at [him]* by" the patentee. *AMP II*, slip op. at 27-28 (emphasis added) (reinstating, in substantially identical language, the Federal Circuit's standing analysis in *AMP I*).  That holding is consistent with a long line of cases from this Court since *MedImmune*.  *See, e.g.*, *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1316-1317 (Fed. Cir. 2011) (no actual controversy where patentee never accused declaratory-judgment plaintiff of infringing patent but only sent letters alleging infringement to purchasers of allegedly infringing product); *Innovative Therapies*, 599 F.3d at 1382 (infringement suits against other parties "do[] not, in the absence of any act directed toward [declaratory-judgment plaintiff], meet the minimum standard discussed in *MedImmune*").[7]

Plaintiffs' opening brief entirely ignores the jurisdictional analysis in *AMP*. The plaintiffs in *AMP*, however, made the same argument Plaintiffs make here— that the patentee's general practice of enforcing its patent gave the plaintiffs the right to seek a declaratory judgment invalidating that patent:

---

[7]    Even in cases where this Court has considered a patentee's activities against third parties, it has never found jurisdiction absent an act of patent enforcement *directed specifically at the plaintiff*.  As this Court stated in *AMP*, where a declaratory-judgment plaintiff has had affirmative patent-enforcement actions directed at him, active enforcement of one's patent rights against others "can *maintain*" an already existing "real and immediate controversy despite the passage of time."  *AMP II*, slip op. 28, 32 (emphasis added); *see also Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 901 (Fed. Cir. 2008) (jurisdiction established where patentee had not only litigated the patents against others but also sent several threatening letters directly to declaratory-judgment plaintiff).

> [A]ccording to Plaintiffs, the awareness of [patentee's] vigorous assertion of its patent rights … continues to suppress their ability to perform clinical *BRCA* testing, placing Plaintiffs in the very dilemma the Declaratory Judgment Act was intended to address:  they must either proceed with *BRCA*-related activities and risk liability for patent infringement, or refrain from such activities despite believing [patentee's] patents are invalid.

*AMP II*, slip op. 27-28.

This Court squarely rejected these arguments in *AMP*, requiring the plaintiffs to show "affirmative patent enforcement actions *directed at them*" by patentee.  *AMP II*, slip op. 28 (emphasis added).  This Court expressly rejected the analysis of the district court in *AMP*, which "failed to limit its jurisdictional holding to affirmative acts by the patentee directed at specific Plaintiffs … [and] erroneously [held] all the Plaintiffs had standing based on 'the widespread understanding that one may engage in *BRCA 1/2* testing at the risk of being sued for infringement liability by [patentee].'"  *Id.* at 35.

*Second*, Plaintiffs' allegations are *factually* insufficient to establish that Plaintiffs face any actual or imminent risk of patent liability.  Plaintiffs trumpet that Monsanto has filed 144 patent-infringement lawsuits.  A154.  But Monsanto filed such suits over a period of 10 years, and, as the district court correctly found, that figure is "hardly significant" when compared to the millions of farms (or even, as *amici* suggest, the many hundreds of thousands of farms) that exist across the United States.  A14.

Furthermore, as the district court correctly found, Plaintiffs fail to establish that these suits were brought against "similarly situated parties," *i.e.*, farmers who did not want to use Monsanto's transgenic seeds. A14-15 (citing *AMP I*, 653 F.3d at 1345). This is a fatal flaw in Plaintiffs' allegations, for they have consistently failed to explain *why* Monsanto would rationally seek to enforce its patents against farmers who were not knowingly using its patented traits.[8] To be sure, Monsanto has sought to enforce its patents against *intentional* infringers, as the publicly available record of cases makes clear.[9] But in the face of Monsanto's denial that it

---

[8]    Plaintiffs never suggest any incentive, financial or otherwise, that Monsanto could possibly have to pursue to pursue growers who have no desire to use Monsanto's transgenic seed technology. A835(10:2-5). Such growers do not use herbicides (such as glyphosate) and therefore would not benefit from the use of Roundup Ready® seed, and Monsanto could not collect significant damages for small amounts of inadvertent gene flow.

[9]    *See, e.g.*, *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) (concluding that the "district court did not clearly err in determining that David planted saved seed" in violation of his Technology Agreement with Monsanto); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1334 (Fed. Cir. 2006) (citing "Scruggs' admissions" to purchasing Roundup Ready® soybeans and cotton, failing to obtain a license, and saving soybean and cotton seed); *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1339 (Fed. Cir. 2004) (noting that "McFarling concedes" he replanted seed from multiple crops, despite entering into Monsanto's Technology Agreement); *see also Monsanto Co. v. Bowman*, 657 F.3d 1341, 1345-1346 (Fed. Cir. 2011) (noting that Bowman [1] purchased seed from a grain elevator, [2] "applied glyphosate-based herbicide" to the fields in which he planted such seed, [3] confirmed that many of the plants were glyphosate-tolerant, and [4] saved the seed from these plants and replanted it in subsequent generations, while continuing to apply glyphosate-based herbicide); *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1378-1382 (Fed. Cir. 2004) (upholding discovery sanctions based on grower's admitted spoliation of evidence by burning saved seed and his "subornation of perjury and lying under oath" about saving patented seed).

enforces its patents against farmers who do not want to grow transgenic crops,

Plaintiffs have done nothing to substantiate their myth that Monsanto pursues

"unintentional infringers."

Plaintiffs did *allege* that Monsanto has filed suit against a handful of

allegedly inadvertent infringers (*e.g.*, Maurice Parr; Percy Schmeiser; Roger,

Rodney, and Greg Nelson; and Troy Roush).  A155.  But as the district court

found, publicly available information directly undermines the contention that these

individuals' infringement was inadvertent.  A15.  A federal judge found, for

example, that Mr. Parr, a seed cleaner,

> misleads his customers by advocating a position that it is legal to save,
> clean and replant Roundup Ready soybeans.  Certainly, it is in the
> public interest to prevent farmers from being confused and misled into
> believing that saving, cleaning and replanting Roundup Ready
> soybeans is not an infringement.

*Monsanto Co. v. Parr*, 545 F. Supp. 2d 836, 844 (N.D. Ind. 2008).  Tellingly, on

appeal, Plaintiffs now omit any reference to Mr. Parr.

Plaintiffs' appellate brief also notably omits any reference to Mr. Schmeiser,

whom a Canadian federal court found to be saving and planting seed "he knew or

ought to have known was Roundup tolerant."  A15 (citing *Monsanto Can. Inc. v.*

*Schmeiser*, 2001 FCT 256 [120] (Can.)); *see also Monsanto Can. Inc. v.*

*Schmeiser*, [2004] 1 S.C.R. 902 ¶¶ 87, 97 (Can.) (upholding trial court's finding of

infringement and observing that "appellants in this case actively cultivated canola containing the patented invention as part of their business operations").

Plaintiffs also cited the case of the Nelsons (A155), but as the district court correctly noted, the public record again makes clear that they were not similarly situated with the Plaintiffs here, who claim to have no interest in using Monsanto's seed. A15. The Nelsons indisputably had signed a license agreement with Monsanto and had intentionally purchased seed under that agreement; the issue was whether they had illegally planted second-generation seed. *See Monsanto Co. v. Nelson*, 2001 U.S. Dist. LEXIS 25132, at *2 (E.D. Mo. Sept. 10, 2001) ("Defendants Greg Nelson and Nelson Farm Enterprise … entered into an agreement to purchase Roundup Ready(R) soybean seeds manufactured by plaintiff Monsanto Company. In connection with the purchase the defendants … agreed that they would not harvest or replant seeds from the Roundup Ready(R) product or from any other Monsanto seed product."). Similarly, the district court cited publicly available information casting significant doubt on Plaintiffs' allegations that Mr. Roush was an "unintentional" infringer. A15.[10]

---

[10]    Plaintiffs also claim that Monsanto leveled "threats" (without filing suit) against other alleged inadvertent users, like Dawn and David Runyon. A154-155. The district court, however, found these allegations to be "diaphanous" and insufficient to establish a substantial dispute. A22. Moreover, the very fact that Plaintiffs must resort to such unsupported and dated accusations, *see infra* note 13, further highlights the lack of any real and immediate case or controversy between Monsanto and these Plaintiffs.

Plaintiffs argue (Br. 20-21) that the district court "committed clear error" by failing to accept Plaintiffs' allegations as true because Monsanto supposedly did not deny these allegations. Monsanto, however, *did* deny Plaintiffs' allegations that Monsanto sues inadvertent infringers. Monsanto, for example, repeatedly stated in its district-court briefs that "*[i]t has never been, nor will it be, Monsanto policy* to exercise its patent rights where trace amounts of [its] patented seed or traits are present in [a] farmer's fields as a result of inadvertent means." A508 (emphasis added); *see also* A513. At oral argument, Monsanto's counsel referred the district court to Monsanto's website, which specifically rebuts Plaintiffs' allegations regarding inadvertent users. A641(34:17-22). Monsanto's counsel also stated at oral argument that Monsanto has "never brought legal action … against somebody who didn't want to make use of the traits that are manifested in [Monsanto's] transgenic products." A835(10:3-5).[11]

Plaintiffs' allegations that Monsanto routinely threatens and sues inadvertent infringers were thus explicitly controverted and open for the district court's resolution. "If the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction …, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction[,]" and all "facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding

---

[11] Plaintiffs correctly note that these statements do not constitute "evidence" (Br. 22), but they are clearly sufficient to deny Plaintiffs' allegations.

by the district court." *See Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-1584 (Fed. Cir. 1993); 5C Wright & Miller, *Federal Practice & Procedure* § 1363 (3d ed. 2012) (where a Rule 12(b)(1) motion "challenges the actual existence of the district court's subject matter jurisdiction, then the pleading's allegations are merely evidence on the issue" and are not controlling).

Indeed, contrary to Plaintiffs' argument (Br. 19-20), this Court's decision in *Cedars-Sinai* does not require a court to accept as true even *uncontroverted* jurisdictional allegations. *Cedars-Sinai*, 11 F.3d at 1583-1584. *Cedars-Sinai allows* a court to do so, but courts always have the independent duty and authority to assure themselves of their own jurisdiction—including by considering materials outside the pleadings—even in the absence of a challenge by any party. *See Land*, 330 U.S. at 735 n.4 ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, the court may inquire by affidavits or otherwise, into the facts as they exist." (citations omitted)).[12]  And because the district court found that many of Plaintiffs' allegations were demonstrably inaccurate, and Plaintiffs presented absolutely *no* actual evidence to support their allegations that Monsanto is pursuing *inadvertent* users, the district court correctly decided not to accept Plaintiffs allegations as true.

---

[12]    *See also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 188-190 (1936); *Wetmore v. Rymer*, 169 U.S. 115, 119-120 (1898).

Finally, *even if one were to credit as true all of Plaintiffs' allegations regarding inadvertent users*, those allegations still would not establish an actual case or controversy between Plaintiffs and Monsanto, because the allegations are exceedingly few in number, are all quite dated, and hardly create a realistic threat of liability to the Plaintiffs here.  In fact, the most recent alleged case (involving Mr. Parr, whom a court found to be intentionally inducing infringement) was filed in 2007.  *See Monsanto Co. v. Parr*, 545 F. Supp. 2d at 836, 844.  The other alleged threats or suits are even older, occurring seven to fourteen years ago.[13] Such a handful of dated allegations involving *other* growers, even if accepted as true, is insufficient to establish a "real and immediate" controversy between Monsanto and the Plaintiffs here, particularly in light of Monsanto's unambiguous statement to Plaintiffs' counsel:

> Monsanto is unaware of any circumstances that would give rise to any claim for patent infringement or any lawsuit against your clients. Monsanto therefore does not assert and has no intention of asserting patent-infringement claims against your clients. You represent that "none of [your] clients intend to possess, use or sell any transgenic seed, including any transgenic seed potentially covered by Monsanto's patents."  Taking your representation as true, any fear of suit or other action is unreasonable, and any decision not to grow certain crops unjustified.

---

[13]    *See* A155 (describing a February 2005 letter from Monsanto to the Runyons); A15 (citing a July 2001 Associated Press article discussing Monsanto's lawsuit against Mr. Roush); A15 (citing *Monsanto Co. v. Nelson*, No. 4:00-CV-1636, filed in 2000); *Monsanto Can. Inc. v. Schmeiser*, 2001 FCT 256 [9] (Can.) (describing the legal action against Mr. Schmeiser, which was "initiated on August 6, 1998").

A183.

Perhaps the most telling evidence against Plaintiffs' notion that Monsanto has undertaken a campaign to threaten and sue individuals who have no desire to use Monsanto's products is Plaintiffs' own inability to provide any direct support for this assertion other than third-party media descriptions, which, as Plaintiffs themselves agree, "are not facts." Br. 21. If Monsanto were conducting such a ubiquitous campaign, one would expect at least one of the current Plaintiffs—who number "more than 300,000 individuals and 4,500 farms or farmers"—to have alleged that that Monsanto had wrongly sued or threatened them.

Yet *not a single Plaintiff* has alleged that he or she was threatened—or even contacted in any way—by Monsanto in connection with Monsanto's patents. This is because Monsanto simply does not enforce its patents against such growers, as it has repeatedly declared. A508; A512-513. The district court correctly found that Plaintiffs' allegations are "unsubstantiated" and "do not carry significant weight." A16; *see also* A22.

### 2.    The non-patent cases that Plaintiffs cite do not change the result

Plaintiffs fault the district court for declining to rely upon cases outside the patent context, including cases involving pre-enforcement review of criminal statutes. *See* Br. 34; A21-22 n.9. As the district court explained, however, those cases are distinguishable and inapplicable here. Each involved a more concrete

33

threat of enforcement by the defendant and/or a more concrete statement by the plaintiff of intent to engage in prohibited conduct.

In *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227 (1937), for example, the parties had a clear, immediate dispute that allowed the insurance company to seek a declaratory judgment against its insured. The insured had made "a claim of a present, specific right" vis-à-vis the insurance company. A21-22 n.9 (quoting *Aetna*, 300 U.S. at 242). In fact, the insured "presented this claim formally," thus evidencing that "the parties had taken adverse positions with respect to their existing obligations." 300 U.S. at 242. Similarly, in *MedImmune*, the patentees affirmatively "claim[ed] a right to royalties under the licensing agreement." *See* 549 U.S. at 128. There was thus no doubt that the patentee was asserting its patent rights directly against the plaintiff. *Id.* at 121 (respondent "delivered petitioner a letter expressing its belief that Synagis was covered by the Cabilly II patent and its expectation that petitioner would pay royalties beginning March 1, 2002"); *see also id.* at 130-132. Here, in direct contrast, Monsanto has never made any claim against Plaintiffs and has affirmatively stated that it "does *not* assert and has *no intention* of asserting" its patent rights against Plaintiffs. A183; *see also* A255.

The other cases cited by Plaintiffs involved pre-enforcement challenges to statutes or regulations involving criminal or civil penalties, and the facts established a likelihood that the Government would, in fact, enforce the disputed

law against declaratory-judgment plaintiffs who wished to engage in prohibited conduct. None involved a situation like that here where the declaratory-judgment defendant expressed that it had "no reason, desire, or intent" to take action against the plaintiff (A255; *see also* A183), or where the plaintiff had stated that it had no intention of engaging in the prohibited conduct (A109).

In *Holder v. Humanitarian Law Project*, for example, the Government had already "charged about 150 persons with violating" the law in question and had not argued that it would refrain from prosecuting plaintiffs, who had affirmatively alleged that they intended to engage in conduct that would violate the law. 130 S. Ct. 2705, 2717 (2010); *see also Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them.").

In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010), the Government stated that the declaratory-judgment plaintiff would be sanctioned if it did not follow the challenged rules. *Id.* at 3150-3151 ("[T]he Government proposes that [the declaratory-judgment plaintiff] incur a sanction (such as a sizable fine) by ignoring Board requests for documents and testimony. If the Commission then affirms, the firm will win access to a court of

appeals—and severe punishment should its challenge fail." (internal citation and

emphasis omitted)).  Similarly, in this Court's decision in *Biotechnology Industry*

*Organization v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007), the

"findings and legislative history of the Act" at issue demonstrated a "strong

likelihood" that the District was "imminently likely to enforce [the Act] against

plaintiffs' members." *Id.* at 1370.[14]  By contrast, Monsanto—far from being

"imminently" likely to enforce its patents against Plaintiffs—has stated it has "no

reason, desire, or intent" to do so.  A255; *see also* A183.

Moreover, challenges to public statutes are different than a challenge to the

validity of a patent.  Unlike a governmental entity defending a statute, a private

patent-holder defending a patent is subject to non-mutual collateral estoppel.

*Compare United States v. Mendoza*, 464 U.S. 154, 158-162 (1984), *with Blonder-*

*Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 349-350 (1971).  This

means that a single ruling of patent invalidity—even if rendered after 100 prior

rulings of validity—will render a patent's claims invalid in all later actions.  *See*

*Blonder-Tongue*, 402 U.S. at 349-350.  Thus, in the face of multiple challenges to

---

[14]     *See also Doe v. Bolton*, 410 U.S. 179, 188-189 (1973) (after finding that
plaintiff Doe, who had been denied an abortion based on a statute, had standing to
challenge the statute, holding that physician plaintiffs also had standing to sue,
where the statute was a "recent" and "not moribund" law derived from a prior
statute under which "physicians were prosecuted" and where the physicians stated
that they "wish[ed] to perform or counsel performance of legal abortions," *Doe v.*
*Bolton*, 319 F. Supp. 1048, 1050 (N.D. Ga. 1970)).

its patent by multiple parties, a patentee has no choice but to defend and win every single suit. This already-significant burden on patentees would increase substantially if individuals, corporations, or associations could freely drag patentees into court even in the absence of any enforcement activity by the patentee.

By contrast, when the government litigates the constitutionality or interpretation of a given statute, the government is not subject to non-mutual collateral estoppel, and the consequences of any particular declaratory-judgment action are not nearly as significant. *See Mendoza*, 464 U.S. 162-163 ("The conduct of Government litigation in the courts of the United States is sufficiently different from the conduct of private civil litigation in those courts so that what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the government."). The government, unlike a patentee, can lose an issue in one forum and continue to litigate that same issue in other jurisdictions until the Supreme Court decides otherwise.

The position of the *amici* intellectual property professors—who advocate "[b]road standing rules" with respect to challenges of patent validity—is untenable and out-of-touch with Supreme Court precedent. Professors' Amicus Br. 18. These *amici* urge this Court to ignore the conduct of the patentee and to hold that

"plaintiffs who allege that they have been restrained from engaging in economic activity due to the presence of a potentially invalid patent" would *always* have standing to sue, regardless of whether the patentee has taken any action whatsoever (against plaintiffs or others) to enforce that patent. *Id.* at 20; *see also id.* at 14-15 ("It is the existence of the patent rather than any specific actions the patent holder may take that creates uncertainty and risk for other potential innovators in the field.").

As an initial matter, the professors' brief is procedurally misdirected: this panel has no power to reverse this Court's earlier decisions like *AMP*, *Innovative Therapies*, and *Prasco*, which may be overruled only by the Court *en banc*. *See Texas Am. Oil Corp. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995).

The professors also do not explain why there necessarily would be a "substantial," "concrete," "definite," "real," and "immediate" controversy—all required under Supreme Court precedent—between a patentee and a declaratory-judgment plaintiff simply because the plaintiff claims to have been deterred from engaging in economic activity by the existence of a potentially invalid patent. As this Court stated in *AMP*, "[s]imply disagreeing with the existence of a patent … or even suffering an attenuated, nonproximate, effect from the existence of a patent does not meet the Supreme Court's requirement for an adverse legal controversy of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." *AMP II*, slip op. 35-36; *see also Prasco*, 537 F.3d at 1338

("*MedImmune* does not change our long-standing rule that the existence of a patent

is not sufficient to establish declaratory judgment jurisdiction."). Indeed, a

plaintiff's subjective apprehension has never been sufficient to create declaratory-

judgment jurisdiction. *See Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("It

is the *reality* of the threat of [] injury that is relevant to the standing inquiry, not the

plaintiff's subjective apprehensions."); *Prasco*, 537 F.3d at 1339.

If adopted, the professors' approach would subject thousands of patentees—

large corporations and small inventors alike—to lawsuits, even if they had never

attempted to enforce (or threatened to enforce) their patents against anyone. It

would not be difficult for a plaintiff to allege that it was deterred from some

economic activity by the existence of one or more patents, and the professors'

approach therefore could indeed "turn patents into licenses to be sued."

Professors' Amicus Br. 12. A large corporation, for example, could haul multiple

patentees into court, potentially leading to overwhelming litigation costs and

coerced settlements for individuals and small companies engaged in innovation.

Such an approach is neither wise policy nor permissible under the precedent

of this Court or the Supreme Court. That precedent has always required a fact-

specific analysis of the immediacy and reality of any alleged dispute between two

parties, and that analysis necessarily involves considering both parties' conduct

(including a patentee's enforcement actions or the lack thereof). *See AMP II*, slip op. at 26; *see also MedImmune*, 549 U.S. at 128 ("Respondents claim a right to royalties under the licensing agreement. Petitioner asserts that no royalties are owing …. The factual and legal dimensions of the dispute are well defined[.]"); *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 99-100 (1993) ("A company *once charged with infringement* must remain concerned about the risk of similar charges if it develops and markets similar products in the future." (emphasis added)).

### B.    Plaintiffs' Own Activity And Allegations Further Underscore The Lack Of Any "Substantial," "Definite," "Concrete," "Real," And "Immediate" Controversy

The absence of any justiciable controversy is further shown by Plaintiffs' own actions and allegations. None of the Plaintiffs is currently making, using, or selling Monsanto's transgenic seed (Br. 15). None asserts any intention or desire to do so. The declaration they are seeking is therefore based on "a hypothetical state of facts," *MedImmune*, 549 U.S. at 127—namely, the possibility that, at some unspecified future date, genetic material containing Monsanto's patented traits would enter their fields and mature into crops containing such traits, which would then be then harvested, sold, or replanted.

This Court has repeatedly declined to find jurisdiction in such theoretical circumstances. Rather, this Court looks to whether the declaratory-judgment

plaintiff has engaged in the "actual manufacture or sale of a potentially infringing product" or conducted "meaningful preparation" toward potentially infringing activity. *Cat Tech*, 528 F.3d at 881; *see also Benitec*, 495 F.3d at 1348-1349. As the district court correctly held, in the absence of "significant, concrete steps to conduct infringing activity," a patent infringement dispute is "neither 'immediate' nor 'real' and the requirements for justiciability have not been met." A11 (quoting *Cat Tech*, 528 F.3d at 880). Where it is "uncertain when, if ever, the declaratory plaintiff would engage in potentially infringing activity, the dispute [does] not present a case or controversy of sufficient immediacy to support a declaratory judgment." A21 (quoting *Cat Tech*, 528 F.3d at 881).

Because Plaintiffs concede no actual infringement has occurred, the vast majority of the Plaintiffs rely solely on their subjective apprehensions of "contamination" and subsequent litigation at some future date to support their jurisdictional argument. *See, e.g.*, A110 (discussing "Plaintiffs' fears" that they will be accused of patent infringement "if and when they become contaminated" in the "future"); A134-135 (alleging Plaintiffs are "fearful that they could become contaminated" and "then be accused" of infringement); A141 (same). Such assertions, however, cannot establish an Article III case or controversy—which "must be based on a *real* and *immediate* injury or threat of future injury that is *caused by the defendants*—an objective standard that cannot be met by a purely

subjective or speculative fear of future harm." *Prasco*, 537 F.3d at 1339 (emphasis added); *see also Lyons*, 461 U.S. at 107 n.8.[15]

A handful of Plaintiffs allege in declarations that, even though they have not yet infringed, they have been forced to: (1) forego growing certain crops out of "fear of contamination … and the resulting risk of being accused of patent infringement" (A707); or (2) perform testing of the seed they purchase due to a "known risk" of "contamination" and their resulting "concern" about an infringement suit from Monsanto (A722, A715).  Although a declaratory-judgment plaintiff's forbearance from activity or steps taken to avoid liability can be used to establish subject-matter jurisdiction, *see MedImmune*, 549 U.S. at 131-132; *SanDisk v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1378 (Fed. Cir. 2007), Plaintiffs' assertions here undermine, rather than support, jurisdiction.

---

[15]     Indeed, as the district court found, Plaintiffs' April 18, 2011 post-lawsuit letter "essentially [] concede[s]" the *lack* of declaratory-judgment jurisdiction and the *un*reasonableness of any subjective apprehension by Plaintiffs, at the time they filed their Complaint on March 29, 2011.  A16 n.6.  Plaintiffs' letter notes that "*[i]f*" Monsanto did not respond to the letter, "[i]t would *then* be reasonable for our clients to feel that they would be at risk of having Monsanto assert claims of patent infringement against them should they ever become contaminated by transgenic seed."  A180-181 (emphases added).  Moreover, the post-lawsuit letter exchange cannot provide an independent basis for jurisdiction, because the existence of a justiciable case or controversy depends on the state of affairs when the original claim for declaratory relief was filed.  *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-571 (2004); *see also Innovative Therapies*, 599 F.3d at 1383-1384 ("[L]ater events may not create jurisdiction where none existed at the time of filing.").

Some Plaintiffs, like Bryce Stephens and Donald Patterson, allege they avoid growing crops like corn and soybeans out of fear of "contamination" and subsequent legal action by Monsanto. *See* A705-709; A718-720. Of course, none of these individuals has any evidence, other than that discredited above, to suggest Monsanto has any interest or motive to enforce its patents against inadvertent users of its products. As the district court correctly found, therefore, this alleged injury is not reasonable based on the objective words and actions of the patentee. A21 n.8.

More importantly, none of these Plaintiffs credibly alleges that infringement (much less the threat of patent enforcement by Monsanto) would have immediately, or even imminently, occurred if they had not altered their conduct. Unlike the one plaintiff found to have standing in *AMP*, no Plaintiff here "unequivocally" alleges that he would "immediately" begin farming the avoided crops if granted a declaration of patent invalidity. *Compare AMP II*, slip op. 31, *with* A707 (alleging only that Stephens "would very much like to" farm corn or soybeans and is "capable" of doing so); A720 (Patterson concluding that "[i]f the risks of transgenic contamination cannot be prudently avoided, and in my judgment they cannot be, economic considerations require that I avoid them entirely."). Rather, these Plaintiffs express only "'some day' intentions" that this Court held in *AMP* are "insufficient to support an 'actual or imminent' injury for

standing 'without … any specification of *when* the some day will be.'" *AMP II*, slip op. 31 (citing *Lujan*, 504 U.S. at 564).

Furthermore, these Plaintiffs fail to allege that their crops would imminently come to contain Monsanto's patented traits—a necessary prerequisite to any potential infringement liability—upon resumption of such farming. *See, e.g.*, A720 (alleging only that "within five years" "all U.S. alfalfa is expected to be contaminated"); A706 (noting that Stephens is "surrounded by neighbors who grow dryland transgenic no-till corn, the seed for which *I believe comes from Monsanto*"). Thus, as the district court found, "*even if* plaintiffs resumed farming of their crops," there is no indication that cross-pollination with Monsanto's traits, and thus, potential infringement liability, is a real and immediate concern. A21 n.8 (citing *Cat Tech*, 528 F.3d at 881).

Plaintiffs argue that the district court erred in not accepting as true the allegation that Monsanto's transgenic seed "will contaminate Plaintiffs" at some point in the future. Br. 25. The district court did, however, find that "some unlicensed—and unintended—use of transgenic seeds is inevitable." A4. Nevertheless, the district court found that Plaintiffs' allegations, even if accepted as true, were insufficient to establish that "potential infringement is a matter of *immediate* concern." A20 (emphasis added).

Plaintiffs attempt to paint this conclusion as error (Br. 26-30), arguing that the district court wrongly required Plaintiffs to "be 'certain' they will be immediately contaminated" or "'certain' of the date on which they will be contaminated" (Br. 30). That is simply incorrect. The district court properly followed this Court's guidance in *Cat Tech* and *AMP*, *see* A21 & n.8, which do not require "certainty" regarding the specific timing of injury but which do require some definite allegations of "actual or imminent" injury. *AMP II*, slip op. 31. Where, as here, "it is *uncertain when, if ever*," the declaratory-judgment plaintiff may potentially infringe, "the dispute [does] *not* present a case or controversy of sufficient immediacy to support a declaratory judgment." *Cat Tech*, 528 F.3d at 881 (emphases added); *see also AMP II*, slip op. 28 (finding that only one plaintiff alleged "a sufficiently real and imminent injury because he allege[d] an intention to actually and immediately engage in allegedly infringing [] activities."); *id.* at 31 (finding "some day intentions" "insufficient to support an actual or imminent injury for standing" (quotations and citations omitted)).[16]

---

[16]    Plaintiffs cite *Dey Pharma, LP v. Sunovion Pharmaceuticals Inc.*, 677 F.3d 1158 (Fed. Cir. 2012), for the proposition that declaratory-judgment jurisdiction requires only the "mere possibility" of injury, not "certainty" of injury. Br. 30. But the district court did not require certainty of injury; it held only that plaintiffs' vague allegations—without any specificity as to when or how they would be injured—were far too speculative to establish the actuality or imminence of any injury. A20-21. Moreover, in *Dey Pharma*, which arose in the highly specific context of the Hatch-Waxman Act, the declaratory-judgment plaintiff (Dey) was facing a much more direct and imminent injury from the patentee's patent rights.

Other Plaintiffs, like Chuck Noble and Fedco Seeds, Inc., test their seeds for transgenic traits and claim to have occasionally discovered "contamination" in seeds for potential purchase. *See* A714-717, A721-723. But these Plaintiffs' assertions are also insufficient to establish a real and immediate controversy. Plaintiffs do not allege they actually purchased, planted, or sold the offending seeds. *See* A715 ("In each case, [Fedco] either rejected or returned the contaminated seed."); A722 (Noble, stating that "the contaminated seed lot was rejected for purchase by me"). Furthermore, as the district court found, these Plaintiffs do not even allege that the "offending seeds were covered by [Monsanto's] patents." A5.

Moreover, although a declaratory-judgment plaintiff's avoidance or undertaking of certain activity can support jurisdiction where such actions are

---

Dey had already been sued by the patentee on two patents, and Dey (as the second Paragraph IV ANDA filer) could obtain FDA approval for its generic drug only by obtaining a judgment that a third patent listed in the Orange Book was invalid or not infringed. *See* 677 F.3d at 1160, 1164. Such a judgment would trigger the exclusivity period of the first ANDA filer and then clear the way for the FDA to approve Dey's application. The patentee (Sunovion) argued that this injury was speculative because it depended on the first ANDA filer delaying its generic launch. *Id.* at 1164. But that injury-causing delay was likely and only a few months from being initiated: "it is well known that the first generic *often* elects to delay entry for various reasons," and it was "that very concern that in part led Congress to enact" subsequent amendments to the Hatch-Waxman Act. *Id.* at 1164-1165 (emphasis added). Moreover, contrary to Plaintiffs' suggestion (Br. 30), the patentee in *Dey Pharma* did not even attempt to argue that its covenant not to sue mooted the case, because, as this Court noted, that argument was squarely "foreclosed" under clear Hatch-Waxman precedent. *Id.* at 1162.

coerced by the declaratory-judgment defendant (*see MedImmune*, 549 U.S. at 131-132; *SanDisk*, 480 F.3d at 1378), the plaintiff's actions in a patent-infringement case must be coerced by *the patentee's interest in enforcing its patent*—not by some other concern that would exist even if the challenged patents were invalidated. *See, e.g.*, *MedImmune*, 549 U.S. at 130 (discussing "situations in which the plaintiff's self-avoidance of imminent injury is coerced by threatened *enforcement action*" (emphasis added)). The issue in this appeal is whether there is an immediate and concrete dispute between the parties *about Monsanto's patent rights*, and any injury sufficient to sustain jurisdiction therefore must be fairly traceable to Monsanto's patent enforcement and remediable by the declaration Plaintiffs have requested. *See Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.").

Plaintiffs, however, cannot claim their changes in farming practices were coerced by any Monsanto patent-enforcement action. The declarations and Amended Complaint indicate these Plaintiffs would continue to test seed for transgenic traits or avoid planting certain crops to avoid cross-pollination *regardless* of potential patent liability to Monsanto. For example, Fedco professes that it has a general policy and reputation for having "zero tolerance" for transgenic traits in its seed. A716. Likewise, OSGATA (of which Bryce Stephens

is a member) has a policy "that transgenic contamination of organic seed constitutes irreparable harm to the organic seed industry … and that any detectable level is unacceptable." A113. Chuck Noble similarly states that he "purposefully do[es] not use genetically engineered (GE) seeds" and "do[es] everything [he] can to avoid having any contact with Monsanto's GE alfalfa seed, as [he] believe[s] it poses a great risk to society." A721; *see also* A720 (Patterson, discussing his "lifelong commitment to the organic agricultural ideal" and his "dedication to food integrity"). Thus, any harm Plaintiffs claim to have experienced is not concretely connected to any alleged patent dispute, and the relief Plaintiffs request would not eliminate that alleged coercion. There is thus no case or controversy under Article III.

In fact, Plaintiffs' requested relief—a declaration of invalidity of Monsanto's patents—would likely *increase* the use of Monsanto's biotechnology, which then would be freely available to growers for use without any patent-law restrictions. For Plaintiffs, this would only increase any perceived need for testing or avoidance of planting particular crops. Likewise, the remedy the Plaintiffs seek would exacerbate, not ameliorate, any societal impact that Plaintiffs purport to link to Monsanto's biotechnology.

Finally, Plaintiffs' activities and allegations do not support subject-matter jurisdiction here because Plaintiffs have failed even to allege which of the 23

48

asserted patents (or which of the 600 claims within those patents) they fear being

accused of violating. The 23 asserted patents cover a wide range of technologies

and crop types. Plaintiffs do not attempt to tie their jurisdictional allegations to

any specific patent or patent claim they believe they might inadvertently infringe

or be accused of infringing. And because none of the Plaintiffs have yet

experienced *any* gene flow from *any* transgenic plants into their crops or seed (Br.

15), it is impossible to discern which of these myriad claims, if any, Plaintiffs

might "potentially" infringe in the future. A144, A152-153. In the absence of

more specific allegations and "clearly delineated, adverse positions by the parties,"

this case is not appropriate for judicial resolution. *Prasco*, 537 F.3d at 1340 & n.8

(no declaratory-judgment jurisdiction where plaintiff failed to show "which if any

of [four referenced patents and 71 referenced claims] defendants could or might

assert").

## II.   WHILE PLAINTIFFS CLEARLY OPPOSE BIOTECHNOLOGY, THEY HAVE NO BASIS TO INVOKE THE JURISDICTION OF THE FEDERAL COURTS TO ADVOCATE THOSE VIEWS

Plaintiffs have an obvious disagreement with the policy of the United States

to permit and promote agricultural biotechnology. They disagree with the

judgment of Congress and the PTO, as affirmed by the Supreme Court and this

Court, that transgenic plants are patentable subject matter.[17]  And they are unhappy

that government agencies such as the USDA have repeatedly affirmed the benefits

and safety of these products and permitted their use in the United States.  Neither

the Patent Act nor the Declaratory Judgment Act, however, makes a patent

infringement case in the federal courts a proper forum for Plaintiffs' anti-

biotechnology campaign.

As an initial matter, federal agencies like the USDA, EPA, and FDA—

through the powers granted to them by Congress and the President—are expressly

charged with addressing the core policy issues underlying Plaintiffs' lawsuit.

Indeed, Plaintiffs' "principal" invalidity argument—that 23 Monsanto patents are

invalid under § 101 because they may be "injurious" to society (A110)—involves

policy questions that must be directed to Congress, which is better positioned than

this Court to evaluate Plaintiffs' concerns.[18]

---

[17]    *See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 145-146 (2001) ("[W]e hold that newly developed plant breeds fall within the terms of § 101, and that neither the PPA nor the PVPA limits the scope of § 101's coverage. As in *Chakrabarty*, we decline to narrow the reach of § 101 where Congress has given us no indication that it intends this result."); *Monsanto Co. v. David*, 516 F.3d 1009, 1014 (Fed. Cir. 2008); *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002).

[18]    *See Diamond v. Chakrabarty*, 447 U.S. 303, 317 (1980) (upholding patentability of human-made micro-organisms but not considering arguments about alleged "grave risks" to society from such organisms because such arguments implicate "a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot."); *see also Juicy Whip, Inc. v. Orange Bang,*

Moreover, the Declaratory Judgment Act does not give courts power to issue opinions on broad policy issues based on hypothetical disputes. The constitutional requirement of a case or controversy "assure[s] that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action. … The federal courts have abjured appeals to their authority which would convert the judicial process into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472-473 (1982) (internal quotation marks omitted).

If Monsanto is really engaging in a broad campaign of threats and enforcement against inadvertent infringers (which it absolutely is not), then it should not be difficult to find at least one such inadvertent user who could raise the noninfringement, invalidity, and unenforceability arguments that Plaintiffs present here. Such arguments would then arise in a clearly delineated, real, and immediate controversy with a "concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472. Unless

---

*Inc.*, 185 F.3d 1364, 1368 (Fed. Cir. 1999) (upholding patentability of a product designed to deceive the public and stating that "[u]ntil such time as Congress [declares particular types of inventions unpatentable] … we find no basis in section 101 to hold that inventions can be ruled unpatentable for lack of utility simply because they have the capacity to [harm] some members of the public.").

51

and until such a case arises, the federal courts are not an appropriate forum for the

Plaintiffs' vague, abstract, and hypothetical allegations.

## CONCLUSION

The judgment of the district court should be affirmed.


Dated:  September 13, 2012                    Respectfully submitted,


                                              /s/ Seth P. Waxman
                                              SETH P. WAXMAN
                                              PAUL R.Q. WOLFSON
                                              TODD C. ZUBLER
                                              GREGORY H. LANTIER
                                              CAROLYN J. CHACHKIN
                                              RACHEL L. WEINER
                                              WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                              1875 Pennsylvania Avenue, N.W.
                                              Washington, D.C.  20006
                                              (202) 663-6000

                                              *Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2012, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send notice of

such filing to the following registered CM/ECF users:

> DANIEL B. RAVICHER
> SABRINA Y. HASSAN
> PUBLIC PATENT FOUNDATION
> BENJAMIN N. CARDOZO SCHOOL OF LAW
> 55 Fifth Avenue
> New York, NY  10003
> (212) 790-0442

/s/ Seth P. Waxman
SETH P. WAXMAN

## CERTIFICATE OF COMPLIANCE

Counsel for Defendants-Appellees hereby certifies that:

1.      The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because exclusive of the exempted portions it contains 12,418 words as counted by the word processing program used to prepare the brief; and

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2003 in a proportionally spaced typeface: Times New Roman, font size 14.

Dated:  September 13, 2012              /s/ Seth P. Waxman
                                        SETH P. WAXMAN