No. 2012-1298

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____


ORGANIC SEED GROWERS AND TRADE ASSOCIATION,
ORGANIC CROP IMPROVEMENT ASSOCIATION INTERNATIONAL, INC.,

*Plaintiffs-Appellants,*

and

OCIA RESEARCH AND EDUCATION INC., NORTHERN PLAINS
SUSTAINABLE AGRICULTURE SOCIETY, MANITOBA ORGANIC
ALLIANCE, UNION PAYSANNE, FAMILY FARM DEFENDERS INC.,
INTERLAKE FORAGE SEEDS LTD., KIRSCHENMANN FAMILY FARMS
INC. and JARDIN DEL ALMA,

*Plaintiffs,*

v.

MONSANTO COMPANY and MONSANTO TECHNOLOGY LLC,

*Defendant-Appellees.*

*(Caption continued on inside cover)*

_____

Appeal from the United States District Court for the Southern District
of New York in No. 11-CV-2163, Judge Naomi Reice Buchwald

_____

***AMICUS CURIAE* BRIEF OF BIOTECHNOLOGY INDUSTRY
ORGANIZATION AND CROPLIFE AMERICA IN SUPPORT OF
DEFENDANT-APPELLEE AND SUPPORTING AFFIRMANCE**

Thomas F. Poché
Christopher E. Jeffers
WOMBLE CARLYLE SANDRIDGE &
RICE, L.L.P.
1200 Nineteenth Street, NW, Suite 500
Washington, D.C. 20036
(202) 467-6900
*Counsel for Amicus Curiae*
*Biotechnology Industry Organization and*
*CropLife America*

THE CORNUCOPIA INSTITUTE, DEMETER ASSOCIATION, INC.,
CENTER FOR FOOD SAFETY, BEYOND PESTICIDES, NAVDANYA
INTERNATIONAL, MAINE ORGANIC FARMERS AND GARDENERS
ASSOCIATION, NORTHEAST ORGANIC FARMING ASSOCIATION OF
NEW YORK, NORTHEAST ORGANIC FARMING
ASSOCIATION/MASSACHUSETTS CHAPTER, INC., NORTHEAST
ORGANIC FARMING ASSOCIATION OF NEW HAMPSHIRE,
NORTHEAST ORGANIC FARMING ASSOCIATION OF RHODE ISLAND,
CT NOFA, NORTHEAST ORGANIC FARMING ASSOCIATION OF
VERMONT, RURAL VERMONT, OHIO ECOLOGICAL FOOD & FARM
ASSOCIATION, FLORIDA CERTIFIED ORGANIC GROWERS AND
CONSUMERS INC., SOUTHEAST IOWA ORGANIC ASSOCIATION,
MENDOCINO ORGANIC NETWORK, NORTHEAST ORGANIC DAIRY
PRODUCERS ALLIANCE, MIDWEST ORGANIC DAIRY PRODUCERS
ALLIANCE, WESTERN ORGANIC DAIRY PRODUCERS ALLIANCE,
CANADIAN ORGANIC GROWERS, PEACE RIVER ORGANIC PRODUCERS
ASSOCIATION, FAMILY FARMER SEED COOPERATIVE, SUSTAINABLE
LIVING SYSTEMS, GLOBAL ORGANIC ALLIANCE, FOOD DEMOCRACY
NOW!, FARM-TO-CONSUMER LEGAL DEFENSE FUND, WESTON A.
PRICE FOUNDATION, MICHAEL FIELDS AGRICULTURAL INSTITUTE,
FEDCO SEEDS INC., ADAPTIVE SEEDS, LLC, SOW TRUE SEED,
SOUTHERN EXPOSURE SEED EXCHANGE, MUMM'S SPROUTING
SEEDS,
BAKER CREEK HEIRLOOM SEED CO., LLC, COMSTOCK, FERRE & CO.,
LLC, SEEDKEEPERS, LLC, SISKIYOU SEEDS, COUNTRYSIDE ORGANICS,
WILD GARDEN SEED, CUATRO PUERTAS, SEED WE NEED, ALBA
RANCH, WILD PLUM FARM, GRATITUDE GARDENS, RICHARD
EVERETT FARM, LLC, PHILADELPHIA COMMUNITY FARM, INC,
GENESIS FARM, CHISPAS FARMS LLC, MIDHEAVEN FARMS, KOSKAN
FARMS, CALIFORNIA CLOVERLEAF FARMS, NORTH OUTBACK FARM,
TAYLOR FARMS, INC., RON GARGASZ ORGANIC FARMS, ABUNDANT
ACRES, T & D WILLEY FARMS, FULL MOON FARM, INC., COMMON
GOOD FARM, LLC, AMERICAN BUFFALO COMPANY, RADIANCE
DAIRY, QUINELLA RANCH, NATURE'S WAY FARM LTD., LEVKE AND
PETER EGGERS FARM, FREY VINEYARDS, LTD., BRYCE STEPHENS,
CHUCK NOBLE, LARHEA PEPPER, PAUL ROMERO, BRIAN WICKERT,
BRUCE DRINKMAN, MURRAY BAST, and
DONALD WRIGHT PATTERSON, JR.,

*Plaintiffs-Appellants*

## CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae* Biotechnology Industry Organization and CropLife America certifies the following:

1.  The full name of every party or *amicus* represented by me is:

    Biotechnology Industry Organization
    CropLife America

2.  The name of the real party in interest, if different from the above, is:

    Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are:

    None.

4.  The names of all law firms and the partners or associates that have appeared for the parties identified above in the lower tribunal or who are expected to appear for the parties in this Court are:

    Womble Carlyle Sandridge & Rice, L.L.P. (Thomas F. Poché and Christopher E. Jeffers) is appearing for Biotechnology Industry Organization and CropLife America in this Court.

September 20, 2012                    Respectfully submitted,

                                      /s/ Thomas F. Poché
                                      Thomas F. Poché

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................................i

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................. 1

INTRODUCTION ........................................................................................... 3

ARGUMENT .................................................................................................. 6

    I.    This Court's Standing Cases Follow Supreme Court Precedent
        and Support the Decision Below. ........................................................ 6

        A.    The Supreme Court and this Court Reject Subjective or
              "Some Day" Allegations of Injury ............................................. 6

        B.    The Standing Requirement Protects the Distinction
              Between Policy Debates and True Cases and
              Controversies ........................................................................ 13

        C.    Standing Cases Addressing Statutory Pre-Enforcement
              and Probabilistic Risk Are Inapposite to the Present
              Litigation ............................................................................ 14

    II.    Neither Law Nor Public Interest Support a Diluted Declaratory
        Judgment Standard in Patent Validity Cases ..................................... 18

        A.    There is No Legal Basis for Lowering Standing
              Requirements in Patent Validity Cases .................................... 18

        B.    The Social Benefits of Patents Do Not Support Dilution
              of the Standing Requirement in Validity Cases ........................ 21

CONCLUSION .............................................................................................. 25

CERTIFICATE OF SERVICE ............................................................................ 26

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ......... 27

# TABLE OF AUTHORITIES

**Cases**

*Altvater v. Freeman*, 319 U.S. 359 (1943)..................................................................6

*Assoc. for Molecular Pathology v. Myriad Genetics Inc.*, 2012 WL 3518509
(Fed. Cir. August 16, 2012)...................................................................... 8, 14

*Babbit v. United Farm Workers National Union*, 442 U.S. 289, 298-300
(1979).......................................................................................................15

*Baur v. Veneman*, 352 F.3d 625, 628, 634-35 (2nd Cir. 2003).................................16

*Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362
(Fed. Cir. 2007)........................................................................................15

*Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993) ............. 18, 19, 20

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S.
167, 181-82 (2000) ....................................................................................13

*Los Angeles v. Lyons*, 461 U.S. 95 (1983)................................................ 8, 9, 10, 12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................... passim

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ................. 10, 11, 12, 14

*National Resources Defense Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006) .......16

*Prasco, LLC v. Medecis Pharmaceutical Corp.*, 537 F.3d 1329 (Fed. Cir.
2008) ..................................................................................................... passim

*SanDisk Corp. v. STMicroelectronics, Inc.,* 480 F.3d 1372 (Fed. Cir. 2007) .........12

*Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 37 (1976)...............6

**Other Authorities**

U.S. Const., art. III, §2 .............................................................................................3

## IDENTITY AND INTEREST OF AMICUS CURIAE

Biotechnology Industry Organization ("BIO") is the country's largest biotechnology trade association, representing over 1100 companies, academic institutions, and biotechnology centers in all 50 states and in countries around the world.  BIO members undertake research and development of biotechnological healthcare, pharmaceutical, agricultural, environmental, and industrial products. BIO members range from start-up businesses and university spin-offs to Fortune 500 corporations.  The vast majority of BIO's members are small companies that have yet to bring products to market or attain profitability, and thus depend on venture capital and other private investment for their growth.

CropLife America ("CLA") is a national, not-for-profit trade association that represents the companies that develop, manufacture, formulate, and distribute virtually all of the crop protection and biotechnology products used by farmers in the United States.

Biotechnology products typically require long development times and large investments before they reach the marketplace. In the case of biological medicines, for example, an average fully-capitalized investment in the range of $1.2 billion is required over almost a decade of R&D work before a typical product obtains approval by the FDA. Some advanced pest- or herbicide-tolerant seed products in use today had to undergo thousands of screening, selection, and field testing steps

over a 12 – 17 year period to meet regulatory requirements for commercial farm use. For the commercialization of a new agricultural trait, the average time from initiation of a discovery project to market launch has been reported as 13.1 years, at a cost of $ 136 million for discovery, development, and regulatory authorization. *See* http://www.croplife.org/PhillipsMcDougallStudy.   Biotechnology companies rely heavily on patents to protect such substantial investments of time, resources, and capital.  Devaluation of patent assets, including their impairment through legal uncertainty, leads to a reduced incentive for companies to conduct research, development, and commercialization of new biotechnology products that heal, feed, and fuel the world.

Accordingly, *amici* have a significant interest in the further disposition of this case and the proper elucidation of standing requirements in patent cases. Although Monsanto is a member of BIO and CLA, Monsanto did not participate in the preparation of this brief, and *amici* have no commercial interest in the parties to or the outcome of this action.

Pursuant to Federal Rule of Appellate Procedure Rule 29(c)(5), *amici* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amici*, its members, or its counsel made a

monetary contribution to its preparation or submission.  Pursuant to Federal Circuit Rule 29(c) and Federal Rule of Appellate Procedure 29(a), *Amici* state that this brief is filed with the consent of all parties.

## INTRODUCTION

BIO and CLA submit this brief in support of the decision below, and also to counter the troubling and unsubstantiated assertions of the *amici* in support of the Appellants.   BIO and CLA reject the proposition that this Court's recent declaratory judgment standing cases have departed from guiding Supreme Court precedent.   Equally important, BIO and CLA reject the proposition of *amicus* Intellectual Property Professors ("IPP") that patent validity issues warrant a departure from, and essentially a dilution of, traditional standing requirements.

Appellants seek to invalidate 23 patents on which Defendants-Appellees' ("Monsanto") products depend.  To gain access to the Federal Courts, Appellants must first demonstrate that they meet the constitutional requirement of having an actual "case or controversy" with Monsanto.  *See* U.S. Const., art. III, §2.  To meet this requirement, Appellants claim to be actually injured by Monsanto because they are presently forced to abstain from growing certain non-transgenic crops, and to incorporate burdensome genetic testing into their business operations, in order to mitigate their risk of being sued for patent infringement by Monsanto.  *See* Appellants' Br. at 15.  At base, Appellants assert that their fields or products will

inevitably be contaminated with Monsanto's product, and fear that Monsanto will then sue them for patent infringement.  *See* Opinion at A4, A6-7.  However, several facts, if correctly determined by the district court, temper these assertions:

1)  Appellants are not currently contaminated with Monsanto product and do not seek to use transgenic seed;

2)  Monsanto is not currently threatening to sue any party;

3)  Monsanto has not sued or threatened to sue any similarly situated party;

4)  Monsanto has publically stated that it is *not* its policy "'to exercise [their] patent rights where trace amounts of our seed or traits are present in [a] farmer's fields as a result of inadvertent means.'"; and

5)  Monsanto informed Appellants that their fear of being sued was "unreasonable."

BIO and CLA further note that there does not appear to be an allegation that a contamination, *if* it occurred, would occur within the term of any patent-in-suit. Absent an in-term contamination, no fear of litigation can exist.[1]

Appellants' claim of injury is thus premised on the notion that they are "coerced" into foregoing the full enjoyment of their land and property in order to mitigate the risk that (i) they could  inadvertently become contaminated with Monsanto product, (ii) at some future point in time; (iii) which could be during the term of a challenged patent; and that (iv) Monsanto might then renege on its policy of not enforcing its patents against precisely such inadvertent contamination, and (iv) could decide to sue one of them.

To be sure, Appellants express great fear that such a string of contingencies might come to pass and subject them to patent enforcement by Monsanto. But purely subjective fear of some future, uncertain event is insufficient to constitute a present, concrete injury.  Nor does acting on such fear - *e.g.*, by abandoning the use of land or adopting expensive testing - transform a hypothetical, future injury into an actual or imminent one. There is a difference between a self-inflicted injury and an injury that can reasonably be traced to "the objective words and actions of the

---

[1] This is not a theoretical issue.  U.S. Patent No. 5,463,175, one of the patents in suit (Opinion at A3 n.2) will presumably expire on October 31, 2012 based on its priority claim.  *See, e.g.*, http://tinyurl.com/5463175.

patentee,"[2] as the district court correctly acknowledged. What remains, then, of Appellants' claim, is not a present injury that can fairly be traced to the patentee, but fear of a future injury that may or may not materialize, depending on numerous contingencies. For good reasons discussed below, no court has ever found standing on such attenuated facts.

## ARGUMENT

I.    **This Court's Standing Cases Follow Supreme Court Precedent and Support the Decision Below.**

A.    **The Supreme Court and this Court Reject Subjective or "Some Day" Allegations of Injury**

"No principle is more fundamental to the judiciary's proper role . . . than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 37 (1976). *Amicus* IPP suggests that this court has been inconsistent and too strict in its declaratory judgment standing cases, while Appellants often only quote from relevant court opinions in passing. Both fail to fully engage with the holdings of

---

[2] Appellants suggest that their alleged injury is akin to the situation faced by the declaratory judgment plaintiff in *MedImmune* (discussed in Section I.A). But cases like *MedImmune* and *Altvater v. Freeman*, 319 U.S. 359 (1943) involved very different factual situations. Unlike the declaratory judgment plaintiffs in those cases, who had to choose between continuing to pay royalties and ceasing such payments and facing liability for infringement (as in *MedImmune*), or who had to choose between abiding by the terms of an injunction and facing contempt proceedings (as in *Altvater*), Appellants' self-avoidance in this case of a future, contingent injury case cannot be attributed to any choice put to them by Monsanto.

the controlling cases, or the fundamental nature of the "case or controversy" requirement. Take, for example, Appellants' reliance on *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

Appellants quote *Lujan* for the basic and undisputed proposition that standing requires, *inter alia*, an injury that is "actual or imminent, not conjectural or hypothetical." *See* Appellants' Br. at 14; *Lujan*, 504 U.S. at 560. Closer attention to the specific analysis in *Lujan* is warranted, however.

In *Lujan,* the Supreme Court found that an environmental group lacked standing to challenge changes to regulations relating to the Endangered Species Act, which the plaintiffs contended would adversely affect wildlife worldwide. 504 U.S. at 557-59. Unable to show *actual* injury, the plaintiffs hoped to show *imminent* injury by stating that they would visit the impacted areas "in the future." *Id.* at 563. The Court unequivocally rejected this proposition, stating "[s]uch 'some day' intentions – without any description of concrete plans, or indeed any specification of *when* the some day will be – do not support a finding in the 'actual or imminent' injury that our cases require." *Id.* at 564.

The clear insufficiency of "some day" allegations to meet the fundamental requirements of standing was reiterated by this court in *Assoc. for Molecular Pathology v. Myriad Genetics Inc.*, 2012 WL 3518509 (Fed. Cir. August 16,

2012).[3]  In *Myriad,* several of the plaintiffs had been engaged in actual, past use of

the patented technology and had been cautioned against further use by the patentee.

*Id.* at \*10.  Nevertheless, this court found that only one party had a *present* interest

to continue conducting allegedly infringing tests.  *Id.* at \*10-\*11.  Other plaintiffs,

who only intended to "consider" resuming testing, were found to lack standing.  *Id.*

Citing *Lujan*, this court specifically rejected such "some day" allegations "without

. . . any specification of *when* some day will be" for failing to comply with the

actual or imminent injury requirement for standing.  *Id.*  Notably, the district court

in this case relied on precisely this holding from this court's prior *Myriad* decision.

*See* Opinion at A20-21.

The requirement for an actual or imminent injury is further constrained by

the understanding that the injury in question must not be subjective.  In *Los

Angeles v. Lyons*, 461 U.S. 95 (1983), the Supreme Court held that a driver's

subjective apprehension that he would be subjected to a police chokehold was too

speculative to sustain standing to seek an injunction against the practice.  *Id.* at

105, 107 n.8.  The Court so ruled even though the plaintiff had been previously

---

[3]  Appellants assert that in *Myriad* this court held that standing of one party confers
standing on all.  *See* Appellants' Br. at 19.  This court clearly did not make that
ruling.  *See Myriad*, WL 3518509 at \*14 ("we reverse the district court's holding
that the various plaintiffs other than Dr. Ostrer have standing . . .").

choked by the police and without relying on the representation that the city had terminated the practice. *Id*. at 105, 109.

Decisions by this court are fully consistent with the Supreme Court's holding in *Lyons* – subjective fears are simply too speculative to sustain standing. In *Prasco, LLC v. Medecis Pharmaceutical Corp.*, 537 F.3d 1329 (Fed. Cir. 2008), this court specifically relied on *Lyons* in affirming the district court's dismissal of the case for lack of standing. *Id*. at 1338-39. Notably, the plaintiff in *Prasco* had an actual product on the market, the patentee refused to give any comfort as to likelihood of future suit and the patentee had enforced other patents against other parties. *Id*. at 1334, 1341. None of these facts, however, "overc[a]me the complete lack of evidence of a defined, preexisting dispute between the parties. . . ." *Id*. at 1340 (noting that the patentee had "taken no affirmative actions at all . . ."). In the absence of an affirmative act by the patentee, the mere knowledge of a patent's existence amounted to no more than a subjective fear, which did not pass constitutional muster.

Nor can plaintiffs avoid the prohibition against basing standing on subjective fears pointing to their own self-imposed actions based on those fears. *See Lujan,* 504 U.S. at 560, 571 (requiring a causal connection between injury and conduct complained of).

Thus, when this court looks for some affirmative act from the patentee, it does so in the context of identifying a likely, imminent injury and excluding subjective fears as required by *Lyons*. And that is precisely what the district court did in this case. In noting the absence of any action by Monsanto against any plaintiff or similarly situated party, the district court explicitly relied on this court's decision in *Prasco* (which in turn was based on the Supreme Court's decision in *Lyons*). *See* Opinion at A12-16.

Similarly, with regard to any purported injury based on withdrawal from farming activities (by some of the Appellants), it is clear that any such conduct was based on their own *subjective* fears, not any *objective* conduct on Monsanto's part. Consequently, and contrary to the requirements of *Lujan*, there was no causality. The district court identified this absence of causal connection between injury and objective conduct. *Id*. at A21, n.8 (noting that parties who had "stopped farming certain crops" had suffered an "injury of their own making," not one based on "the objective words and actions of the patentee.")

The Supreme Court addressed the limits of declaratory judgment standing in patent cases in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). Although Appellants cite *MedImmune* to emphasize the flexibility of the Supreme Court's standing analysis, they fail to acknowledge that *MedImmune* in no way relaxed the requirement for an actual or imminent injury.

10

Prior to *MedImmune*, this court required a declaratory judgment plaintiff to demonstrate a reasonable apprehension of being sued. *Id*. at 122 and n.11. In *MedImmune*, however, the declaratory judgment plaintiff (MedImmune) was a royalty-paying licensee of the patent-in-suit. *Id*. at 120, 134. With a paid license in force, MedImmune did not face a risk of liability for infringement and could not establish standing under the then-existing test. *Id*. at 122. At the same time, however, MedImmune made it clear to the patentee-licensor (Genentech) that it was paying royalties under protest, as it believed the patent to be neither valid nor infringed. *Id*. at 122. MedImmune also alleged, without contradiction, that Genetech would use the patent to enjoin sales of MedImmune's product were MedImmune to suspend payment. *Id*.

Under the prevailing law, MedImmune could have established declaratory judgment jurisdiction *only* by withholding payment, thereby breaching the license and creating a reasonable apprehension of suit. *Id*. at 128. It was on this specific point that the Supreme Court reversed. *Id*. at 137.

Although the Supreme Court broadened the scope of declaratory judgment jurisdiction in *MedImmune* in the sense that it removed the impediment of an unbreached license, it did not revise its prohibitions regarding "some day" allegations or subjective fears. Rather, the Court reaffirmed precedent requiring a

current and clearly defined dispute regarding the parties' respective obligations, including the undisputed likelihood of litigation. *Id*. at 128.

This court, in turn, has looked to *MedImmune* in both finding and denying standing. In *SanDisk Corp. v. STMicroelectronics, Inc.,* 480 F.3d 1372 (Fed. Cir. 2007) this court held that, absent a license, standing generally requires at least "some affirmative act by the patentee. . . ." *Id*. at 1381, 1383 (finding standing where patentee demonstrated willingness to enforce its patent rights and asserted a conclusion of infringement that provided the affirmative acts despite a statement that it would not sue). In *Prasco*, discussed *supra*, the court affirmed a finding of no standing precisely because there was an absence of any affirmative acts. Both decisions rejected the notion that standing might be predicated on the mere existence of a patent. *SanDisk*, 480 F.3d at 1381; *Prasco*, 537 F.3d at 1338.

The IPP *amicus* argues that this court's current declaratory judgment jurisprudence is inconsistent with Supreme Court precedent and (presumably improperly) tailored to patent law. IPP Br. at 1-2, 7. Careful review of this court's decisions reveals that this charge is simply not true. This court's rejection of "some day" allegations and "subjective fears" rely explicitly on the Supreme Court's decisions in *Lujan* and *Lyons*. *Prasco* and *SanDisk* affirm that at least some affirmative act on the part of the patentee is required, consistent with the Supreme Court's *MedImmune* decision where the licensor had demanded ongoing

12

royalties in the face of the licensee's contention, *inter alia*, that it did not infringe the patent in question.  It is simply untenable to suggest that this court – and by extension, the district court below – is on anything but solid ground when it relies on the Supreme Court's significant constraints on declaratory judgment standing to guide its decisions.

## B.    The Standing Requirement Protects the Distinction Between Policy Debates and True Cases and Controversies

The Supreme Court has been steadfast in rejecting cases that fundamentally articulated broad, and no doubt sincere, policy concerns rather than concrete cases or controversies.  One need only look to the Court's prior cases regarding environmental issues to see the distinction between impermissible policy arguments and true cases or controversies.  In *Lujan*, the Court rejected wide ranging concerns about the impact of government regulations on endangered species absent a direct and imminent showing of impact on the plaintiffs.  In contrast, where plaintiffs have alleged a direct, current and specific impact, and not simply a policy disagreement, standing has been upheld.  *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc*., 528 U.S. 167, 181-82 (2000) (noting that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff" and finding standing where plaintiffs directly and currently suffered from challenged pollution).

Appellants allegations are strikingly similar to the broad brush and ultimately unsuccessful approach attempted by other groups who in the past sought access to the courts for their generalized policy grievances. Appellants are a large and diverse group, attacking a large collection of patents of differing scope and term, yet they cannot specify a relevant time frame in which they might suffer injury (*i.e.*, being sued) or even that they are likely to ever be "injured" at all. As aptly put in *Myriad*, "[s]imply disagreeing with the existence of a patent … or even suffering an attenuated, non-proximate, effect from the existence of a patent does not meet the Supreme Court's requirement for an adverse legal controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Myriad*, 2012 WL 3518509, *14 (citing *MedImmune*, 549 U.S. at 127).

### C.     Standing Cases Addressing Statutory Pre-Enforcement and Probabilistic Risk Are Inapposite to the Present Litigation

Appellants and *amici's* reliance on statutory pre-enforcement cases and on cases where standing was based on increases in probabilistic risk are no more apt than their policy arguments. In the statutory pre-enforcement cases, parties have standing to challenge statutes where they are actually engaged, or about to engage, in activities that are directly impacted by the statutes in question. In the probabilistic risk cases cited by *amicus* IPP, generally some change in the law or

event results in the plaintiffs being exposed to an increased, ongoing risk of harm. In these cases there is no question about "some day" or "subjective" injuries.

The statutory pre-enforcement cases stand for the straightforward proposition that "[w]hen plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *See Babbit v. United Farm Workers National Union*, 442 U.S. 289, 298-300 (1979) (holding the UFW had standing to challenge statute regulating election procedures where UFW had actively attempted to represent workers and engaged in activities implicated by the statute). Similarly, in *Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007) this court found that BIO and PhRMA, whose members include pharmaceutical companies actively engaged in selling drug products had standing to challenge a law that sought to regulate the price of such products. *Id*. at 1370-71 (also considering whether the District of Columbia was likely to enforce the statute, and concluding that it was).

In both *Babbit* and *BIO*, the cases had reached the "but for" point of litigation – the declaratory judgment plaintiffs engaged or were about to engage in

conduct that the State had taken the "affirmative act" of regulating. No more facts remained to emerge. In the instant case, however, the contingent nature of Monsanto's patent enforcement, at an uncertain point in the future, compounded by Monsanto's stated policy disavowing enforcement against inadvertent contamination and its statement to Appellants that fear of suit was "unreasonable," defeats any analogous finding.

In the probabilistic risk cases the risk of harm, e.g. a challenged government regulation subjecting any of a large class of plaintiffs to an increased lifetime risk of skin cancer, is ongoing, stochastic, and outside the control of any actor, such that the harm might manifest itself randomly, at any time. *See e.g., National Resources Defense Council v. EPA,* 464 F.3d 1, 6 (D.C. Cir. 2006) (cautioning against broad acceptance of probabilistic risk in standing analysis absent "substantial probability" of injury); *Baur v. Veneman*, 352 F.3d 625, 628, 634-35 (2nd Cir. 2003) (finding standing where USDA regulation increased the risk of disease transmission, in violation of statutes designed to minimize health risks, but limiting standing analysis to exposure to harmful products). This is not such a case. Appellants simply do not suffer an ongoing, probabilistic risk of patent enforcement that might randomly strike any of them at any time.

The decisions of this court, and the trial court below, rely directly on the controlling Supreme Court precedent regarding declaratory judgment standing. Appellants' citation of inapposite pre-enforcement or probabilistic risk cases does not change the conclusion that the trial court correctly dismissed Appellants' case for lack of standing.

## II.    Neither Law Nor Public Interest Support a Diluted Declaratory Judgment Standard in Patent Validity Cases

### A.    There is No Legal Basis for Lowering Standing Requirements in Patent Validity Cases

Shorn of the alleged inconsistency between the standing analysis of this court and the requirements set forth by the Supreme Court, the arguments of the IPP *amicus* stand more accurately revealed as a request for special, diluted standing in patent validity cases.  IPP cites footnote 12 from the *Prasco* decision and claims that this court has recognized "the difference for justiciability purposes between actions seeking a declaration that a patent is invalid and those seeking a declaration that a particular product or method does not infringe a patent. . . ."  *See* IPP Br. at 8.  IPP also suggests that the Supreme Court's decision in *Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993) supports a free standing right to challenge validity even in the absence of an infringement risk.  IPP Br. at 17.  Neither assertion bears scrutiny.

Footnote 12 in *Prasco* merely states that the court *has not reached the issue* regarding whether or not its standing analysis would have been impacted if plaintiff had admitted that its current product infringed the patent and had sued for a judgment of invalidity.  *Prasco*, 537 F.3d at 1342, n.12.  Clearly then, the court has not "recognized" a distinction between infringement and validity as IPP purports.  Indeed, given that the patentee in *Prasco* had taken "*no affirmative*

actions" it is hard to see how the distinction argued by IPP could have been made without fatally conflicting with this court's well established rule – a rule that was acknowledged in *Prasco* itself -- that the mere existence or knowledge of a patent is insufficient to support standing. *Id*. at 1338, 1340.

IPP's citation of *Cardinal Chemical* fares no better. The issue before the Supreme Court was *not* whether Cardinal Chemical had a free-standing right to challenge the validity of a competitor's patents even if it was free from any fear of infringement. Rather, the issue was whether an actual case or controversy remained regarding the trial court's invalidity ruling once the Federal Circuit affirmed the trial court's noninfringement ruling or whether the Federal Circuit's *per se* practice of vacating invalidity judgments was constitutionally warranted. 508 U.S. at 87-88, 95. Notably, the defendant, Cardinal Chemistry, had been sued by the patentee. *Id*. at 86. Consequently, Cardinal Chemistry was indisputably subject to an *actual* case, which supported its counterclaim in the first instance. *Id*. at 96. Furthermore, the Court was only asked to address the jurisdictional requirements of the appellate court, not the trial court. *Id*. at 95. Within these constraints, the Supreme Court found that the case or controversy regarding

invalidity that was present before the district court persisted on appeal. [4] *Id*. at 96-97.

Having concluded that the Federal Circuit had power to decide the validity issue, the Court then discussed the benefits of doing so, including the public's interest in the finality of patent litigation and validity issues. *Id*. at 100. These policy rationales should not be confused, however, with a suggestion that these rationales alone would somehow meet the case or controversy requirement.

As noted in Section I, *supra*, there is no inconsistency between this court's jurisprudence regarding standing and that of the Supreme Court. As shown in this Section, there is no doctrinal support for the proposition that patent validity somehow warrants a dilution of the requirements that a case or controversy be actual or imminent, not "some day" and not merely a product of subjective fears. Patent issues, like environmental or criminal justice issues, all must meet these fundamental, constitutional requirements. This court and the district court below have done so.

---

[4] The Court also stated that once standing is established, it is presumed to persist absent intervening events. *Cardinal Chemical*, 508 U.S. at 98.

**B.    The Social Benefits of Patents Do Not Support Dilution of the Standing Requirement in Validity Cases**

To effectively dilute the standing requirement, as proposed by Appellants and their *amici,* would exact a cost not only on the courts, which would be forced to deal with poorly defined suits.  Creating a special, relaxed rule for patent actions would also negatively impact technology companies who rely on their patents for many business purposes other than patent enforcement.  Such patentees could be subjected to invalidation actions for patents on which they critically depend, for example, to facilitate business formation, to access capital and attract investment, to form partnerships and joint ventures, to meet goals in their business plans, to engage in technology transfer with publicly-funded research institutions, and to make funding decisions for product development programs.

The biotech, crop protection, and pharmaceutical industries depend on patent-driven activities to fuel the development of new inventions and products that benefit the public.  In the farming community, the patent system helps drive the development of improved seed and crop protection products, increasing harvests, allowing conservation of arable land, and ultimately helping to feed the world's growing population.  Notably, almost all of the foregoing activities are highly regulated by government agencies such as the FDA, EPA, and USDA,

which have decided that these developments are socially useful and should be promoted.

*Amicus* IPP argues that "patents pose a risk to economically valuable activity. . . ." in that they operate as "scarecrows" that, in injurious ways, deter activity by their mere presence in a field of endeavor. IPP Br. at 11-13. But what does this really mean? What IPP characterizes as "risk" simply describes an informed decision to respect the patent rights of others - something that the patent system incentivizes and without which it could not function. In the aggregate, respect for patent rights stimulates, not deters, socially beneficial activity – for example, it incentivizes competitors to invest in noninfringing alternatives, design-arounds and improvement inventions rather than mere copycat products, thereby contributing to the diversity of products in the marketplace and accelerating their innovation.

Even in instances where a patent may pose a freedom-to-operate obstacle, businesses find that licensing, cross licensing, administrative challenge in reexamination, post-grant review or *inter partes* review, or acquisition of the adverse patent may be available solutions that allow them to continue to invest in innovation without having to litigate. Just this past year, Congress provided for new adversarial proceedings in the USPTO to resolve disputes over the validity of

patents without having to seek access to the courts. Congress also protected certain research and development activities under the Section 271(e)(1) infringement safe harbor.  And should the time come for litigation, companies are normally in the kind of commercial dispute that meets the case or controversy requirement anyway.  While BIO and CLA do not dismiss that an adversely-held patent in the hands of an aggressive competitor can have an impact on business decisions, it is simply not our experience that the mere existence of a patent causes the kinds of paralyzing, deterrent effects *amicus* IPP would have us be concerned about.  In our experience, patents encourage licensing, collaboration, and other commercially efficient solutions far more often than they cause destructive conflict, litigation, and abstention.

In the farming profession in particular purported fears about events that may or may not happen years in the future ring more than a bit hollow.  Appellants, just like their fellow farmers everywhere, face more substantial business risks every day without succumbing to paralyzing fear.  Most farmers choose to stay in business despite real risks of drought, flood, pests, blight, disease, swings in the commodities markets, and the like.  Most farmers also accept the possibility that they might someday find themselves in legal disputes over water or land use rights, boundary conflicts, zoning, tax assessment, drainage disputes, or disputes over contracts for the lease of land and equipment.  Most farmers continue to operate

their farms despite the hypothetical possibility of such disputes, without demanding the kinds of absolute assurances that are supposedly needed in this case.

Indeed, this case amply demonstrates why the Supreme Court rejects "subjective fears" as a basis for standing – it is simply too easy to recast policy objections as subjective fears and injuries. Patents, which are presumed to be valid, properly operate as a government-sanctioned balance of economic interests. There is simply no basis for undermining standing requirements due to an unsubstantiated belief that the drafters of the Constitution, Congress and the Patent Office all got the balance wrong.

## CONCLUSION

For the reasons above, amicus respectfully submits that the judgment of the district court should be affirmed.

Dated: September 20, 2012                Respectfully submitted,


/s/ Thomas F. Poché
Thomas F. Poché
Christopher E. Jeffers
WOMBLE CARLYLE SANDRIDGE &
RICE, L.L.P.
1200 Nineteenth Street, NW, Suite 500
Washington, D.C. 20036
(202) 467-6900

*Counsel for Amicus Curiae
Biotechnology Industry Organization
and CropLife America*

# CERTIFICATE OF SERVICE

I hereby certify that, on September 20, 2012, I caused the foregoing *AMICUS CURIAE* BRIEF OF BIOTECHNOLOGY INDUSTRY ORGANIZATION AND CROPLIFE AMERICA IN SUPPORT OF DEFENDANT-APPELLEE AND SUPPORTING AFFIRMANCE to be filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all participants in the case who are registered CM/ECF users.


/s/ Thomas F. Poché
Thomas F. Poché

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Rule of Appellate Procedure 29.  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 5100 words.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 2007 in 14-point Times New Roman font.

September 20, 2012                          /s/ Thomas F. Poché
                                                          Thomas F. Poché

                                                          *Counsel for Amicus Curiae*
                                                          *Biotechnology Industry Organization*
                                                          *and CropLife America*

27